MAY and another vs. THE BUCKEYE MUTUAL INSUR-
ANCE COMPANY.

FIRE INSURANCE POLICY: *Effect of answers to printed interrogatories, written down by agent of insurer — Meaning of " survey " in policy — Parol evidence that agent did not state accurately the answers of the assured — What assured must prove in first instance — Error in refusing nonsuit cured*

1. How far the plaintiff in an action on an insurance policy must, in the first instance, introduce proof of a continued compliance on his part, with all its provisions, *quære.*

2. Where a motion for a nonsuit is improperly denied, but the requisite proof is afterward supplied, the error is cured.

3. A policy of insurance was issued upon a factory which was only run during a part of the year, and the answers to the company's printed interrogatories, stating the use of the building and the precautions against fire, were such as, from their nature, were appropriate only to the time during which the mill was run ; and the agent who issued the policy was made fully aware of the facts, and himself filled up the

application, and wrote down such portions of the applicant's statements as he considered important. *Held,* that the company, even if it had not expressly made itself responsible for the agent's accuracy could not avoid liability for a loss incurred during the season when the factory was stopped, on the ground that the answers in the application were warranties that the same state of things should continue during the life of the policy.

4. The policy in this case, after stating what the application must contain, and that any false description by the assured, or omission to make known any fact material to the risk, shall render said policy void, adds: "But the company will be responsible for the accuracy of surveys made by its agents." *Held,* that the word "survey" must here be construed to include the whole application, when made out by the agent, and the company is thus expressly precluded from taking advantage of his inaccuracy or omission in drawing the same, where the facts have been fully stated to him by the assured.

5. Parol evidence is admissible, in such a case, to show that the agent, in filling out the application, did *not* accurately and fully state the answers of the assured.

APPEAL from the Circuit Court for *Dane* County.

In November, 1867, the defendant company issued to the plaintiffs a policy of insurance against fire, upon machinery in their "steam power stave factory," at Wrightsville, in Brown county, in this state. The conditions annexed to the policy, and made a part of the contract, included the following: "I. Applications for insurance must specify the construction and materials of the building to be insured, or containing the property to be insured; by whom occupied, and whether as a private dwelling, or how otherwise; its situation with respect to contiguous buildings, and their construction and materials; whether any manufactory is carried on within or about it; and, in case of goods or merchandise, whether or not they are of the description denominated hazardous, extra hazardous, or included in the memorandum of special rates. And a false description by the assured of a building, or of its contents, or the omission to make known any fact material to the risk, or, in a valued policy, an overvaluation, shall render absolutely void a policy issued upon such description or valuation. But the company will be responsible for the

accuracy of surveys and valuations made by its agents. If, after insurance is effected, * * the risk be increased by any means within the control of the assured, * *, such insurance shall be void." "IX. All persons insured by this company, and sustaining loss or damage by fire, are forthwith to give notice thereof to the company; and, as soon after as possible, to deliver in a particular account of such loss or damage, signed with their own hands, and verified by their oath or affirmation, and also, if required, by their books of account," etc. "XII. Whenever a policy is made and issued upon a survey, description or representation of certain property, such survey, description or representation shall be taken and deemed to be a part and portion of such policy, and a warranty on the part of the insured, as fully as if the same were therein written or referred to." By the terms of the policy any loss was to be paid "within sixty days after notice and proof thereof made by the insured, in conformity to the conditions" above stated. The policy was issued after one Fisher, the local agent of the defendant company (at Menasha, Wis.), had furnished the company with a certain printed and written instrument, which upon the back thereof is denominated a "Survey of Stave Factory at Wrightstown, Wis., owned and occupied by *Messrs. May & Co.*," and which, after stating the name and residence of the applicants, the general nature of the property sought to be insured, its value, and the amount of insurance applied for, contained a series of printed questions with blank spaces for answers, and with a direction prefixed, as follows: "The applicant will answer the following questions, and sign the same, as a description of the premises, on which the insurance will be predicated." At the end of these questions was a diagram, showing the position of said stave factory with reference to surrounding objects. Of the questions and answers only the following need be stated here. The answers are in parentheses. "12. *Hours.* During

what hours are the premises worked? (Six A. M. to seven P. M.: sometimes seven P. M. to six A. M.) How many hands employed? (About 20.) 15.. *Watchman.* Have you a night watch always on duty? (We have.) Is the building left alone at any time after the watchman goes off duty in the morning, until he returns to his charge at evening? (It is not.) Is any duty required of him other than watching for the safety of the premises. (None.) 19. *Force Pump.* Is there a force pump upon the premises *expressly for putting out fire?* (There is.) Is it a good pump, and at all times in condition for *immediate* use? (It is.) How often is it tried to know if it is in order? (Every two or three days.) * * * * And the said applicants hereby covenant and agree to and with said company, that the foregoing is a just, full and true exposition of all the facts and circumstances in regard to the condition, situation, value and risk of the property to be insured, so far as the same are known to the applicant, and are material to the risk." This application was signed by the plaintiffs in their firm name, and is referred to in the policy as the "warranty" of the insured, and "a part" of said policy.

The property insured was destroyed by fire a little after midnight on the morning of the first of January, 1868; and this action was brought to recover the loss. The defense was, 1. That at the time of the fire, and for about thirty days previous, "said premises were not, nor was any part thereof, worked," nor were there any hands employed therein; that plaintiffs did not keep a night watch on duty during those thirty days; and that the force pump kept on the premises for the purpose of putting out fire was not tried during the same period, as often as once in two or three days, or otherwise, to know if it was in order. 2. That plaintiffs did not, upon the occurring of the loss, forthwith give notice thereof to the defendant, nor did they, as soon thereafter as possible, deliver to the defendant a particular

account of such loss or damage, signed with their own hands and verified with their oath or affirmation.

On the trial, the plaintiffs made proof of the insurance and loss, and one of them testified that three or four days after the fire, and as soon as Mr. Fisher, the company's agent above mentioned, reached home, he gave notice of the loss to said agent, who said he would notify the company; that said Fisher prepared the proofs of the loss, and the same were then sworn to by one of the plaintiffs, and left with Fisher, who promised to forward them to the company; that plaintiffs did not have any direct communication with the company until some time in the following spring; and that the proofs of loss forwarded by Fisher did not have a certificate attached under the hand and seal of a magistrate or notary public, such as is described in the above-mentioned "condition" of the policy. It did not appear from the evidence that such a certificate was furnished sixty days before the commencement of this action. It appeared that about the 8th of January, 1868, Fisher gave notice of the loss to the secretary of the company, who wrote back to him: " You can forward proofs to this office for us to look over, but give no encouragement as to pay until I can look it over;" that the proofs of loss (without magistrate's certificate) were forwarded by Fisher, and received by the secretary on the 28th of January; and that in April the secretary wrote to Fisher, requesting him to tell plaintiffs that the company declined to pay the loss, on the ground that plaintiffs did not keep a watchman "as they agreed to in their application and survey." No evidence was offered to show that the mill continued, until the time of said loss, to be in the same condition and used in the same manner as represented in the "application" above described. Upon this evidence the defendant moved for a nonsuit, which was denied.

The defendants then introduced evidence, of which the following is all that is material here: Mr. Hudson,

the secretary of the company, testified that, on the 8th of February, 1868, he had an interview at Menasha with *Mr. May*, Mr. Fisher being present. "My object in calling upon *Mr. May* was to ascertain whether the conditions of the application had been complied with. I asked him * * if there was a watchman in charge of the building at the time of the fire. He said, No. I then asked, in that immediate connection, if the warehouse had been closed for a considerable length of time, and I think he said three or four weeks. The impression I got was, that during the time it was closed the watchman was not on duty. * * I had the proofs of loss with me. I made no objection that they were not perfect. I think the conditions were mostly complied with, and, at any rate, we did not raise an objection. * * *Mr. May* said distinctly that there was no watchman there at the time of the fire. He followed that remark by saying that the warehouse had been closed for three or four weeks. From the connection of the two remarks, I inferred that the watchman had not been around there for two or three weeks." One Marsh testified that there were no men employed *in the factory building* after said 14th of December, 1867, but several men were engaged during the day working *in the yard;* that on the day last mentioned the factory was swept out clean, and closed up, and it so remained, no fire being kept therein, until the time of the loss; and that, in that section of country, stave factories do not usually run in the winter. The testimony of this witness, on direct and cross-examination, tended also to show that, from the time the factory was closed until the loss occurred, he was employed by plaintiffs to watch and take care of the factory, but did not usually spend the whole night at the building, and was expected to render some other help during the day to the man employed in the yard, when his duty as watchman did not require his attention.

The rebutting evidence for the plaintiffs included the following: Mr. Fisher, the defendant's local agent

above mentioned : "The application in this case is in my handwriting, except the signature. I filled it out for the parties. I got my information to fill it up by visiting the property and looking it over myself, and from the statements of plaintiffs. [The foregoing was admitted against defendant's objection.] I went and examined the premises thoroughly myself, and filled out the application, and took it down to them, and they signed it. * * * When I took the insurance, I tried to get another thousand. Plaintiffs said they were going to shut down in about thirty days, and that it would not pay." *Question* : "When you came to that part of the questions in the application which refers to the night watch, what was said about that?" *Answer :* "*Mr. May* says, 'You know we never keep fire in this factory in winter, nor keep it running.', Says I, 'That is all right, if you shut it up tight, and sweep it out nice; I had rather you would do that than to run it.'" *Question :* "Did they tell you they did not keep a watch during the night?" *Answer :* "Certainly they did." On cross-examination this witness further said, in substance, that he filled out the application in his office at Menasha, neither of the plaintiffs being then present, and that he wrote the answers to the questions partly from his own knowledge and examination of the premises, and partly from memoranda of answers given by *Mr. May* to his inquiries; that he did not inquire whether they had a force pump, because he saw that for himself, but did inquire how often it was tried. "Says I, 'How often do you try this pump?' 'O,' says he, 'when we are running we usually try it two or three times a week.'" *Question :* "Why did you not put down the answer as he gave it to you?" *Answer :* "I did not deem it necessary, for [when not running] they did not have any fire in the building; I did not consider it of so much importance." The witness said further, that he asked *Mr. May* whether they had a night watch; that the latter answered, "We have while we are run-

ning;" and that witness did not put down the answer in that form, because he did not deem the risk as great when they were without a night watch and not running, as when they were running with such a watch. The witness further said that he could not tell whether he read the application to plaintiffs before they signed it; and that he thought they did not read it before signing it. *Mr. Symes*, one of the plaintiffs, testified that, on the day before they agreed to take the insurance, plaintiffs informed Mr. Fisher that they were going to shut down in a month or so, and did not keep a night watch except when they were running, and Fisher answered that "that was satisfactory, as the risk would be diminished by taking all the fire out of the building." Mr. Hudson, the secretary of the company, testified for defendant, that Fisher was never authorized to "deviate in any manner from the printed instructions in regard to the liability of the company in insuring upon any of these policies." Fisher testified, for the plaintiff, "I have not had any instruction whatever from the company; they only sent me the papers to do business with. They did not send me any instructions of any kind that I know of, printed or written."

The court, before instructing the jury directly upon the issues, commented on the "abuse of witnesses," in which, it said, counsel on both sides had indulged, and remarked: "These witnesses, upon both sides, are strangers. I can only say for myself that I have seen nothing in their conduct or bearing not fair and gentlemanly, or in their testimony to impeach their honesty." It then instructed the jury, in substance, that it was made the plaintiffs' duty, as a condition precedent to a recovery, to give the company notice of the loss forthwith, and it was for the jury to say whether plaintiffs did so, but that if the company, in subsequently directing its agent to receive and forward the proofs, and in all its negotiations with the plaintiffs, did not raise any such question, but received the proofs and passed upon

the claim upon other grounds, without notifying plaintiffs of any defect in their proofs or notice, then the jury might find that it had waived a strict compliance with the requirements of the policy in those respects. It also gave the following: "If you should find that plaintiffs had not kept a watchman at night, or had not kept the factory in operation all the while, or had not tried the force pump every two or three days, or had not kept employed in the building the number of hands mentioned in the application, you will then consider the testimony as to what occurred between the insured and the agent of the company at the time the agent took and filled out the application; and if you should find that the insured then stated to the agent that they were going to shut up the factory during the winter, and that they kept a night watch and tried the force pump only during the time they ran the mill, and that the agent drew the application and wrote out the answer after such facts had been communicated to him by the insured, and gave them to understand, when they signed the application, that such was the effect only of those questions and answers, and plaintiffs signed the application, supposing such to be the effect of such answers, and relying upon defendant's agent that such was their meaning, then defendants are estopped from insisting upon a different construction. * * * It is conceded that Fisher, the agent in this case, prepared the application; and it was his duty to state truly in his application the answers given him by the insured, and if he did not do so, the company should be liable for the error instead of the insured." The following instructions asked by defendant, were refused: "1. If you find that proof of this loss was not furnished until the 28th of January, 1868, it was not a compliance with the terms of the contract of insurance, and plaintiffs cannot recover." "2. A notice of the loss given eight days after the fire is not a notice *forthwith* within the meaning of the contract of insurance; and if no other

notice was given to the company, plaintiffs cannot recover." Other instructions asked by defendant, contravening those given as above stated by the court, were refused.

Verdict for the plaintiffs. Motion for a new trial, for error in the admission of evidence, and in the instructions, and because the verdict was contrary to the evidence. Motion denied, and judgment upon the verdict; from which defendant appealed.

*Carpenter & Chase*, for appellant, argued, 1. That the court erred in refusing a nonsuit, because when plaintiffs rested there was no proof of a performance of the contract on their part in relation to the keeping of a night watch, the condition of the force pump, the number of hands employed, or in any other particular. *Craig v. U. S. Ins. Co.*, 1 Pet. C. C. 410 ; *Wilson v. Hampden Ins. Co.*, 4 R. I. 159 ; 14 Mees. & W. 95 ; 12 Wend. 452 ; 2 Phillips on Ins. (5th ed.) 653. 2. The representations contained in the application about the employment of a watchman, the hours the premises were worked, the force pump and its condition, etc., were warranties that such should continue to be the condition of affairs during the life of the policy, and they must have been strictly complied with to entitle plaintiff to recover. *Clark v. Ins. Co.*, 8 How. (U. S.) 235 ; *Roberts v. Ins. Co.*, 3 Hill, 501 ; *Kennedy v. Ins. Co.*, 10 Barb. 285 ; *Jefferson Ins. Co. v. Cotheal*, 7 Wend. 72 ; *Stout v. Ins. Co.*, 12 Iowa, 371 ; *Tebbetts v. Ins. Co.*, 1 Allen, 305 ; *Glendale Woolen Co. v. Ins. Co.*, 21 Conn. 19 ; 19 N. Y. 179 ; 17 id. 391 ; 14 Mees. & W. 95 ; *Barrett v. Ins. Co.*, 7 Cush. 175 ; 16 Wis. 523. 3. The written contract cannot be varied or contradicted by any conversation had between the parties prior to or contemporaneous with its execution. *Brown v. Ins. Co.*, 18 N. Y. 385 ; *Jennings v. Ins. Co.*, 2 Denio, 75 ; *Higginson v. Dall*, 13 Mass. 96 ; 14 id. 12 ; 2 Allen, 569 ; *Finney v. Ins. Co.*, 8 Met. 348 ; *Lee v. Ins. Co.*, 3 Gray, 583 ; *Barrett v. Ins. Co.*, 7 Cush. 175 ; *Kennedy v. Ins. Co.*, 10 Barb. 285 ; *Chase v. Ins. Co.*, 20 N. Y.

52; 7 Gray, 261. 4. Plaintiffs cannot recover on the ground of any fraud on the part of the company or its agent; because they sue *on the contract*, and the complaint does not allege fraud. For the same reason they cannot recover on the ground of mistake. 5. Nor can it be held that defendant should be *estopped* by the pretended conversation of Fisher, while plaintiffs are *not* estopped by their own written contract deliberately executed. *Brown v. Ins. Co.*, 18 N. Y. 385. 6. Counsel insisted that the *survey*, for whose correctness the company held itself responsible, was merely the *diagram* at the end, and did not include the questions and answers contained in the *application*. *Nicoll v. Ins. Co.*, 3 Woodb. & M. 534; *Denny v. Ins. Co.*, 13 Gray, 497. 7. Plaintiffs were bound to know that Fisher had no authority to make any verbal agreement contradicting the written one. He made out the answers *for them*, and was *their* agent, and not the defendant's, in so doing. 3 Gray, 594. 8. *Notice* of the loss was not given forthwith; and the defect was not waived by defendant in giving the case an examination afterward. *Trask v. Ins. Co.*, 29 Pa. St. 198; *St. Louis Ins. Co. v. Kyle*, 11 Mo. 278; *Cornell v. Ins. Co.*, 18 Wis. 387. 9. The remarks of the circuit judge, expressing his opinion touching the credibility of the witnesses, are clearly a departure from the principle that the jury are to judge of the credibility of the witnesses *as they appear to the jury*. *Franklin Fire Ins. Co. v. Hamill*, 6 Gill, 96.

*E. W. Keyes* (with *J. C. Hopkins*, of counsel), for respondents, to the point that the subsequent conduct of the company was a waiver of any objection to the notice and proof of loss, cited *Warner v. Ins. Co.*, 14 Wis. 318. 2. A fair and reasonable construction of the contract would not require the plaintiffs to keep a night watchman, etc., except when the factory was running — that being an extraordinary precaution required only by the extraordinary risks which then existed. *Prieger et*

*al. v. Ins. Co.*, 6 Wis. 89.   3. It was competent for plaintiffs to show that they gave the agent full and correct information, and that he omitted a part of it from the written application prepared by him, without their knowledge, or induced them to sign the application by representing that part of their answers omitted as unimportant, or that the expressions used in the application meant only that they were to keep a watchman, and try the force pump every two or three days, while running.   These facts *estopped* the company from setting up a defense on the ground that a watchman was not kept, nor the force pump tried, for some time before the fire.   *Kelly v. Ins. Co.*, 3 Wis. 254; 6 id. 89 ; *Beal v. Ins. Co.*, 16 id. 241 ; *Plumb v. Ins. Co.*, 18 N. Y. 392 ; *Rowley v. Ins. Co.*, 36 id. 550, overruling many former cases in that state ; *Howard Ins. Co. v. Bruner*, 23 Pa. St. 50 ; *Roth v. Ins. Co.*, 6 McLean, 324; *Howard Fire Ins. Co. v. Cormack*, 24 Ill. 455 ; *Hough v. Ins. Co.*, 29 Conn. 10 ; *Protection Ins. Co. v. Harmer*, 2 Ohio St. 452 ; *Harris v. Ins. Co.*, 18 id. 120 ; 37 N. H. 35 ; 40 id. 333 ; *Boggs v. Ins. Co.*, 30 Mo. 63 ; *Gaylord v. Ins. Co.*, 40 id. 16, 557 ; *Combs v. Ins. Co.*, 43 id. 148 ; *Ayres v. Ins. Co.*, 21 Iowa, 185 ; *People's Ins. Co. v. Spencer*, 53 Pa. St. 353 ; 16 Pet. 495 ; 3 Woodb. & M. 527 ; 8 How. 235.

The following opinion was filed at the June term, 1869 :

PAINE, J.   We shall not attempt to determine how far a plaintiff in an action on a policy of insurance is bound to introduce proof, in the first instance, of a continued compliance on his part with all the provisions in the policy, in order to avoid a motion for a nonsuit.   It has been said by a writer on this subject, who refers to authorities upon the point, that he must, in the first instance, prove a compliance "with *express warranties and conditions precedent*."   2 Phillips on Insurance, p. 653.   But these companies have adopted the practice of inserting a provision that every thing said by the

assured, in reference to the subject-matter, should be considered as an express and continuing warranty during the life of the policy. And it would be intolerable, if, by reason of this, plaintiffs in such cases were bound in the first instance to introduce affirmative proof of the truth of every representation made, and of a continuous compliance with every answer as to the mode of using the property. There are some things which, from the nature of such contracts, are conditions precedent, and a compliance with which the plaintiff ought to prove, to establish a *prima facie* case. There are others which are from their nature conditions subsequent, or exceptions to the liability of the company, and which should properly be presented as defenses. And whether the companies, by inserting this provision that every thing said by the assured shall be an express warranty, can change the essential character of these provisions, and impose on plaintiffs the burden of proving affirmatively the truth of every statement made, in order to establish a *prima facie* case, may constitute a question of some interest when it becomes necessary to decide it.

But in this case the motion for a nonsuit was overruled. And the defendant assumed the burden of showing a non-compliance by the plaintiffs with all the conditions of the policy in respect to which a non-compliance was claimed. Both parties introduced fully their evidence upon this subject. The question then is, whether, upon the case as it was finally submitted to the jury, the appellant has any thing to complain of. It is a familiar rule, that even when, strictly speaking, a motion for a nonsuit ought to have been granted for some defect in the proof, yet, if it is overruled and the defect subsequently supplied, there is no ground for reversal.

The principal reason why the company denies its liability is, the alleged fact that the assured did not comply with the undertaking to keep a night watchman, and to keep the factory running, and to have the pump

in constant readiness for use. The property insured was a stave factory worked by steam. This alleged undertaking of the assured to keep a watchman constantly, to keep the factory running through the life of the policy, and to have the pump always in readiness for use, is founded upon the answers to the questions ordinarily put in respect to the mode of using the property.

The answer to the question, "During what hours are the premises worked?" was, "From 6 A. M. to 7 P. M.; sometimes from 7 P. M. to 6 A. M."

To the question, "Have you a night watchman always on duty?" the answer was, "We have."

It was also stated that the building was not left alone at any time after the watchman went off duty in the morning until he returned at evening.

It was said, also, that there was a good force pump on the premises expressly for putting out fire, and that it was "at all times *in condition for immediate use.*" Also, that it was tried every two or three days to know if it was in order.

It may be true, as claimed by the appellant, that, according to the current of authority, these statements would be held to be continuing warranties that the same state of things should continue during the life of the policy. But it has always seemed to me that to apply that rule to cases of this character was to impose on the transaction a construction which it does not fairly or reasonably bear, and to make a contract for the parties which they did not make for themselves.

Both the questions and answers in such cases purport to relate only to the then existing condition of things. Notwithstanding this, it is entirely reasonable and just to say, that, in respect to those things that, according to the usual course of the business, are permanent and continuing, the parties intend to agree that they shall be kept in the same condition. The assured undertakes to make no changes in the condition of the premises or

the mode of using them, outside of the usual mode of conducting the particular business.

But it seems to me a stretch of construction to say that the assured undertakes, by such answers, to continue to use the property, through the life of the policy, in the precise manner then indicated, though such continued use would be contrary to the well-known usage and nature of the particular business. Thus, suppose a policy should be taken in the summer for one year on a steamboat used in navigation? Suppose a similar class of questions should be put and answered? The owner is asked, "During what hours is the boat run?" He answers, "It is run night and day." He says that a regular watch is kept at all hours of the night; that there are pumps worked by the engine, ready at all times for immediate use to extinguish fires; and that a dozen hands are employed on the boat. Would there be any reason in holding that this was an undertaking by the assured that the same condition of things should exist through the winter months, when the boat was not used, but was frozen in the ice of some river? Manifestly not. It would be absurd to assume that the parties so intended or understood.

The same thing seems equally true here. It was proved that the factory was never run in the winter. This fact was well known to the agent of the company, and the assured knew that he understood it. It is true of most of the mills that are engaged in the great lumbering business of this state. When, therefore, a policy is taken out upon one of these mills, or a factory like this, while it is running, and questions are asked and answered truly as to the description of the property and the mode in which it is then used, it would be as unreasonable to say that they amounted to a warranty by the assured that the same state of things should continue during the winter months, when according to the usual custom and course of the business the property was not used at all, as it would be to say so in the case

Vol. XXV.—20

of the steamboat. I agree fully with the remarks of the circuit judge upon this point, who gave it as his opinion that the only reasonable construction of such a policy was, that "those provisions in relation to the number of hands employed, the force pump and the night watch, related only to the time or season of the year when that mill, or those of a similar character, were operated."

Upon this subject I have given my own views, as, in consequence of other facts appearing in the case, it became unnecessary for the court to decide the question. There seems to be a conflict of authorities upon the point, and there are certainly some very respectable ones which would sustain the construction that I have suggested ought to be put upon this policy. See *Schmidt v. Insurance Co.*, 41 Ill. 295, and cases cited.

Those other facts are, that the whole truth in relation to these matters was fully disclosed to the agent of the company by the assured, and that he himself prepared the papers, filled up the application, and wrote down such portions of the answers as he considered material or important. The assured explicitly informed him that the night watch was kept, and the pump examined and kept in readiness for use, only when the mill was running. This fully appears by his own testimony, and he says, probably with good reason, that he did not write that down in the answers, because he considered that the risk was much less .when the factory was not running, even without any of these precautions, than it was when running with them all.

The recent cases upon this subject fully sustain the position, that, upon this state of facts, the company is responsible for the accuracy and omissions of its agent, even without any express undertaking to be so, and that it cannot avoid liability by reason of any discrepancy between the real facts as disclosed to him and his presentation of them in the papers. The tendency of modern decisions has been strongly to hold these com-

panies to that degree of responsibility for the acts of the local agents which they scatter through the country, that justice and the due protection of the people demand, without regard to private restrictions upon their author-ity, or to cunning provisions inserted in policies with a view to elude just responsibility. See the following authorities: *Rowley v. Ins. Co.*, 36 N. Y. 550 ; *Colum-bia Ins. Co. v. Cooper*, 50 Pa. St. 331 ; *Viele v. Germania Ins. Co.* (supreme court of Iowa), Western Jurist, Octo-ber, 1868, p. 297 ; *Franklin v. Atlantic Fire Ins. Co.*, 42 Mo. 457 ; *Ins. Co. v. Schetteler*, 38 Ill. 166.

Some of these cases are directly to the effect that, upon the facts here presented, the company would be liable for a loss happening as this did, after the factory had stopped running, although there was no night watch, and no pump in readiness for use.

We think the same conclusion follows, in this case, from an express stipulation in the policy. The company there agrees, that it "*will be responsible for the accu-racy of surveys and valuations made by its agents.*" Its counsel claim that the word "survey," as here used, means only that which was merely matter of measure-ment or description. But we think, whatever may be its strict meaning, it has acquired in insurance cases a general meaning, which includes what is commonly called the application, which contains the questions propounded on behalf of the company and the answers of the assured. It was evidently used in this general sense in this policy. It first states what the appli-cation must contain. It then declares that any false description by the assured, or omission to make known any fact material to the risk, shall render the policy void. And then immediately follows the provision above quoted : "But the company will be responsible for the accuracy of surveys made by its agents."

The context shows that the subject-matter to which this clause had reference was the application. And the entire provision relating to that subject was evidently

intended to inform the assured what the application must contain, and for what failures he would be held responsible, but also to inform him that, where those applications were filled out by the agents, in accordance with the usual practice, the company would be responsible for their accuracy, where the facts were fully and truly represented to them. Notwithstanding what is said in *Denny v. Ins. Co.*, 13 Gray, 497, we think this was the evident meaning of the word "survey" as used in this provision. And the case of *Glendale Man. Co. v. The Protection Ins. Co.*, 21 Conn. 19, which was cited by the appellant upon another point, is a direct authority to show that the word has this general meaning. The court says, on page 32: "Fire policies are issued upon certain interrogatories and answers, denominated the *survey*, often extending over two or more pages, and embracing not only the present but the future condition of things, and the future conduct of the insured."

We have no hesitation, therefore, in holding that this is the true meaning and effect of this clause in the policy. And it only shows that in this case the company expressly assumed a responsibility, which, in the absence of such an assumption, the court, upon the facts of this case, would have imposed upon it. And the company in such case is held liable, not upon the ground that parol evidence may vary the written contract, but that the company is estopped from taking advantage of the blunders of its own agents to avoid liability, after it has itself received the full benefit of the contract.

In this case there is no ground for the objection that parol evidence is admitted to vary the contract, for the contract itself, in expressly providing that the company would be responsible for the accuracy of surveys made by its agents, evidently contemplated an inquiry into the question, whether the agent, in filling out the application, had accurately stated the answers of the assured.

In respect to the claim that the proof of loss was not in time, the court instructed the jury correctly, both as to what constituted a strict compliance with the provision, and what would constitute a waiver on the part of the company. The subsequent conduct of the company was fully sufficient to warrant the jury in finding a waiver, if there was any defect, and the secretary expressly testified that they made no objection upon that ground.

This disposes of all the questions that seem material to be noticed.

*By the Court.* — The judgment is affirmed.

The defendant's counsel moved for a rehearing, on the ground that the court had not discriminated between a waiver of the *proofs* of loss in the form required by the conditions of the policy, and a waiver of the *immediate notice* of loss there required; and they contended that the plaintiff's own evidence in this case showed that the notice was not given *forthwith*, and that there could be no waiver of the defense on that ground, except by an express contract to that effect upon a new consideration. To this point they cited 18 Wis. 587; 11 Mo. 278; 29 Pa. St. 198.

The motion for a rehearing was denied at the January term, 1870.