BLUMER and another vs. THE PHŒNIX INSURANCE COMPANY.

INSURANCE AGAINST FIRE. *(1, 2) What statements in application are promissory warranties. (3) Effect of promissory representation. (4) Warranties or material representations, not promissory; to what time they refer. (5) Case stated. (6) Effect of assured not seeing policy before paying premium.*
REVERSAL OF JUDGMENT. *(7, 8) Immaterial errors.*

1. In the written application for insurance of a mill against fire, the applicant, in answering the questions whether the mill was ever left alone, and whether there was a watchman in it during the night, said: "No regular watchman, but one or two hands sleep in the mill." By a stipulation in the same instrument, the applicant "warrants, covenants and agrees to and with" the insurer, that his statements therein are "a full, true and just exposition of all the facts and circumstances, condition, situation and value of the property," and are "offered as a basis of the insurance requested," and are "made a special warranty," etc. The policy stipulated that it should be avoided by any false representation by the assured of the condition, situation and occupancy of the property, or any omission to make known every fact material to the risk. *Held*, that, in view of these stipulations, the answer above recited was an express *warranty* by the assured that one or two of his employees lodged in the mill each night; and was also a promissory and continuing undertaking, which bound him to a substantial compliance with its terms during the life of the policy.

2. After stating that the lubricating oil used in the mill was whale oil, the applicant, by the printed form of the application, was asked to agree, and did agree, that no lubricating oil should be used which was "mixed with or composed of petroleum or any kind of earth or coal oils." *Held*, that this addition of an express promise as to the future use of oil, will not prevent the answer above recited touching a watchman, from being regarded as a promissory undertaking.

[3. LYON, J., is of opinion that if the statement as to watchmen be regarded as merely a *representation*, and not a warranty, it was still promissory and continuing, and a failure to keep it good, material to the risk, would defeat a recovery on the policy.]

4. Where the delivery of a policy is delayed by failure of the assured to pay the premium, the application for such policy and its delivery are regarded in law as contemporaneous acts; and warranties in the application, or representations therein material to the risk, must at least be true *at the time of such delivery*, or they will avoid the policy.

5. The application was made December 3d, and, from delay of the applicant to pay the premium, the policy was not delivered until December 28th;

no employee of the assured lodged in the mill at night after December 25th; and the mill was destroyed by fire several weeks later. *Held*, that there can be no recovery on the policy.

6. The mere fact that the assured did not see the policy before he paid the premium, is immaterial.

7. The policy being void on grounds alleged in the original answer, the question whether amendments of the answer setting up other defenses were properly allowed, is immaterial.

8. Errors in the admission of evidence, which could not affect the judgment, are no ground for reversing it.

TAYLOR, J., dissents from the judgment.

APPEAL from the Circuit Court for *La Crosse* County.

Action on a .policy of insurance against loss by fire, issued by the defendant company to the plaintiff *Blumer*, on his flouring mill and the machinery therein. By the terms of the policy, the loss, if any, was made payable to the plaintiff *Bliss* (who held a mortgage on the insured property), to the extent of his mortgage claim. *Blumer* made written application for the insurance, in which he answered a series of questions propounded on behalf of the insurance company concerning the situation, occupancy, mode of use, and value, of the mill and machinery. Among these questions are the following: " *Watchman.* Is there a watchman in the mill during night? Is the mill ever left alone?" to which *Blumer* answered: " No regular watchman, but one or two hands sleep in the mill." The application was made December 3, 1875, but, owing to the failure of the plaintiffs to pay the premium, the policy was not delivered to *Blumer* until the 28th of that month. The above answer was true when the application was made, and employees of *Blumer* continued to lodge in the mill at night until December 25th, after which. time no one lodged there. The insured property was destroyed by fire January 13, 1876, in the night time.

The application for the insurance contains the following stipulation signed by the plaintiff *Blumer:* " And the said applicant hereby warrants, covenants and agrees, to and with said company, that the foregoing is a full, true and just exposition of all the facts and circumstances, condition, situation

and value of the property to be insured, and is offered as a basis of the insurance requested, and is made a special warranty, the same as if written on the face of the policy." It is also stipulated in the policy, that, "if any application, survey, plan or description of the property herein insured is referred to in this policy, such application, survey, plan or description shall be considered a part of this contract, and a warranty by the assured, and any false representation by the assured, of the condition, situation and occupancy of the property, or any omission to make known every fact material to the risk, or an overvaluation, or any misrepresentation whatever, either in a written application or otherwise," shall render the policy void.

Upon the facts above stated (which are undisputed), a verdict was returned for the defendant by direction of the court; and plaintiffs appealed from a judgment rendered against them pursuant to the verdict.

For the appellants, a brief was filed signed by *M. P. Wing* and *G. C. Prentiss* as attorneys, and *S. U. Pinney*, of counsel, and the cause was argued orally by *Mr. Pinney* and *Mr. Wing*. They contended, 1. That if the answer to the question respecting a watchman was a mere representation, and not a promissory warranty, the jury should have been permitted to determine whether it was material. *Elliott v. Ins. Co.*, 13 Gray, 139; *Jones v. Ins. Co.*, 51 N. Y., 318; *Williams v. Ins. Co.*, 57 id., 274; *Robinson v. Ins. Co.*, 27 N. J. Law, 134. There is a great difference of opinion as to whether one or two hands sleeping in a mill, entering at all hours of the night, and using lights, would not *increase the risk*, so as to require the insurer's *permission* that they should sleep there. *Catlin v. Ins. Co.*, 1 Sum., 434. 2. That in case of doubt whether a statement is intended as a warranty, it will be treated as a representation. *Blood v. Ins. Co.*, 12 Cush., 474; *Wilson v. Ins. Co.*, 4 R. I., 141; *Gilliat v. Ins. Co.*, 8 id. 282; *Frisbie v. Ins. Co.*, 27 Pa. St., 325; *U. S. Fire & M. Ins. Co. v. Kimberly*, 34 Md., 224; *Stout v. Ins. Co.*, 12 Iowa, 374. The policy is to be construed most liberally in favor of the insured. *Ins. Co. v. Slaughter*, 12 Wall., 404. Where the application

is filled out by the agent of the insurer, and the insured is an illiterate man, not acquainted with the language, the terms used are to be construed strongly against the insurer. *Ins. Co. v. Wilkinson*, 13 Wall., 222; *Geib v. Ins. Co.*, 1 Dillon, 446–7. Where statements made in an application are not called for by any question, they will be held mere representations. *Hartford Protection Ins. Co. v. Harmer*, 2 Ohio St., 452. 3. That if the language is a warranty at all, it is made so by the terms of the policy, and not by the stipulation at the foot of the application. *Owens v. Ins. Co.*, 56 N. Y., 565, 572–4. 4. That if the answer is a warranty, it should be regarded as merely a warranty *in præsenti*. *Schmidt v. Ins. Co.*, 41 Ill., 295; *Aurora F. Ins. Co. v. Eddy*, 55 id., 213; *O'Niel v. Ins. Co.*, 3 N. Y., 122; *Smith v. Ins. Co.*, 32 id., 399; *Frisbie v. Ins. Co.* and *Gilliat v. Ins. Co.*, *supra;* Wood on Fire Ins., 336. That this answer was not regarded as a promissory warranty, is obvious from the requirement of a specific promise in regard to the future use of petroleum, in addition to a similar statement of the existing fact in respect to such use. It is also obvious from that provision of the policy which declares that any false representation of the condition, situation or occupancy of the property, or any omission to make known every fact material to the risk, or an overvaluation, or any misrepresentation whatever, in the written application or otherwise, or any increase of the risk by any means whatsoever, within the control of the insured, and without the consent of the company indorsed upon the policy, should render it void. Counsel further contended that so far as the policy was taken out, with full knowledge of the company, for the benefit of the plaintiff *Bliss* as mortgagee, he was entitled to recover, notwithstanding any acts of the mortgagor which might render it void as to the latter. *Grosvenor v. Ins. Co.*, 5 Duer, 517; *Traders' Ins. Co. v. Robert*, 9 Wend., 405.

For the respondent, a brief was filed by *Cameron, Losey & Bunn*, and the cause was argued orally by *Mr. Losey* and *Mr. Bunn:*

Where the policy refers in terms to the application and

makes its statements warranties, they are such: and, so far as they relate to the present state of facts, they must be strictly true, and so far as they relate to the future, and to customs of business and to precautions taken to prevent fire, they must be followed as far as lies in the power of the assured, or the contract of insurance cannot be enforced. *First Nat'l Bk. v. Ins. Co.*, 50 N. Y., 45; *Ripley v. Ins. Co.*, 30 id., 136; *Rohrbach v. Ins. Co.*, 62 id., 47; *Miles v. Ins. Co.*, 3 Gray, 580; *Houghton v. Ins. Co.*, 8 Met., 114; *Tibbitts v. Ins. Co.*, 1 Allen, 305; *Glendale Woolen Co. v. Ins. Co.*, 21 Conn., 19; *Miller v. Ins. Co.*, 31 Iowa, 216; *Wustum v. Ins. Co.*, 15 Wis., 138; *Hinman v. Ins. Co.*, 36 id., 159; *Fuller v. Ins. Co.*, id., 599; *Sawyer v. Ins. Co.*, 37 id., 503, 518; May on Ins., § 158. Even considered as a present warranty only, it would be fatal, as it was not true when the contract took effect. May on Ins., § 190. But, whatever its form, such a statement of the precautions taken to prevent fire, of the custom of the assured in caring for his mill and conducting his business, is from its nature a continuing warranty, and would be wholly futile if not so regarded. 2 Parsons on Con., 430, and cases hereafter cited. Whether a technical warranty or not (*Daniels v. Ins. Co.*, 12 Cush., 423-4), such a statement must be substantially complied with. By putting the questions and answers in writing, and by the assured covenanting that they are a full, fair and truthful statement, the parties have established that the matters inquired of and the answers given are material. May on Ins., § 185; *Wilson v. Ins. Co.*, 4 R. I., 141, 155 et seq.; *Houghton v. Ins. Co.*, supra; *Campbell v. Ins. Co.*, 98 Mass., 381, 402; *Chaffe v. Ins. Co.*, 18 N. Y., 376; *Le Roy v. Ins. Co.*, 39 id., 90; *Price v. Ins. Co.*, 17 Minn., 497, 509; *Conover v. Ins. Co.*, 3 Dillon, 221, 224; *Hinman v. Ins. Co.*, supra; *Anderson v. Fitzgerald*, 4 H. L. Cas., 494; *Cazenove v. Ins. Co.*, 6 C. B., N. S., 437. In further support of the foregoing views, counsel also cited *May v. Ins. Co.*, 25 Wis., 304-5; *Crocker v. Ins. Co.*, 8 Cush., 79; *Clark v. Ins. Co.*, 8 How., U. S., 235; *S. C.*, 2 Woodb. & Min., 472; *City of Worcester v. Ins. Co.*, 9 Gray, 27; *Sheldon v. Ins. Co.*, 22 Conn.,

242; *Murdock v. Ins. Co.*, 2 Coms., 210. To the point that contracts of insurance are to be construed by the same principles and rules as other contracts, they cited May on Ins., § 179; *Sawyer v. Ins. Co.*, 37 Wis., 508, 518; *Aurora Ins. Co. v. Eddy*, 49 Ill., 107; *Robertson v. French*, 4 East, 135; and they contended that while the words of the policy are to be taken most strongly against the insurer, the representations and warranties on which the policy is founded, are the words of the assured, and should not be construed more favorably to him than to the insurer (May on Ins., p. 183); but that the rule of construction applies only where the language is ambiguous, and that where the words are free from ambiguity, as here, their plain common-sense meaning is to be followed. Broom's Leg. Max., 378; *Shore v. Wilson*, 5 Scott's N. R., 1037; *Montgomery v. Ins. Co.*, 16 B. Mon., 427.

Lyon, J. The distinction in the law of insurance between a warranty and a mere representation is well settled and understood. Stipulations in the policy, or, what is the same thing, stipulations in some other writing which the parties expressly agree shall be a part of the policy, although not inserted in it, whether the same are statements of existing facts, or that certain acts shall thereafter be done, or a certain condition of things continue, are, in general, part of the contract and express warranties, unless it can fairly be gathered from the whole contract that the parties did not so intend. A breach of any such warranty, at least any substantial breach of it, whether material to the risk or not, will defeat a recovery on the policy.

A representation is, strictly speaking, no part of the contract, but precedes the contract and is the inducement to it. It is sufficient if it be substantially true, and; unlike a warranty, it need only be true as to matters which are material to the risk — that is, as to those matters which might reasonably influence the insurer in taking or rejecting the risk, or in fixing the rate of premium therefor.

A majority of the members of the court incline to the opin-

Blumer and another vs. The Phœnix Ins. Co.

ion that, by virtue of the stipulation of the plaintiff *Blumer* in his application for the insurance, and the condition of the policy, quoted in the statement of the case, the answer to the questions, " Is there a watchman in the mill during night? Is the mill ever left alone? " was an undertaking by *Blumer*, in the nature of an express warranty, that one or two of his employees lodged in the mill each night, although they were not regular watchmen.   And further, we are of opinion that the same is a promissory and continuing undertaking, which bound the insured to a substantial compliance with its terms from the time the policy was delivered until the mill and machinery were burned.

These views seem to be sustained by the great weight of authority; but only a few of the cases will be mentioned.   In *Glendale Woolen Co. v. Protection Ins. Co.*, 21 Conn., 19, the plaintiffs, in their application for insurance, answered the following question in the affirmative:   " Is there a watchman in the mill during the night? "   It was held that this answer was " an exact, clear and certain engagement by the insured that they will keep a watchman in their mill through the hours of every night during the week," and that a noncompliance therewith was fatal to an action on the policy.   The same doctrine was held in *Sheldon v. Hartford Fire Ins. Co.*, 22 Conn., 235.

In *Houghton v. Ins. Co.*, 8 Met., 114, the questions, " Is a watch kept constantly in the building?   If no watch is constantly kept, state what is the arrangement respecting it," were answered by the insured in their application as follows:   " No watch is kept in or about the buildings; but the mill is examined thirty minutes after work."   Upon the question whether this representation of the usual practice amounted to a condition or stipulation that it should be continued, Chief Justice SHAW, delivering the opinion of the court, said: " It was ruled at the trial, and the whole court are now of the opinion, that, as this examination was manifestly intended as a substitute for a constant watch; as it was one which the assured had it in their power to make or cause to be made; as it was one of

the precautions tending to secure the property against danger of fire, and tending to its safety, it was one which, as a general practice, the assured was bound to follow, although an occasional omission, owing to accident, or to the negligence of subordinate persons, servants, or workmen, not sanctioned nor permitted by the assured, or by their superintendent, manager or agent, might not be a breach or noncompliance."

To the same effect are the cases of *Worcester v. Ins. Co.*, 9 Gray, 27; *Clark v. Ins. Co.*, 8 How. (U. S.), 235; *Ripley v. Ins. Co.*, 30 N. Y., 136; *First Nat. Bank v. Ins. Co.*, 50 id., 45, and other cases cited in the brief of counsel for the defendant. In all of these cases, the questions and the answers of the insured thereto, as in this case, were contained in the application, and were in the present tense; and in each of them the answer was held to be either a warranty or a representation that the same condititions should be substantially maintained during the life of the policy, failing which, the policy was void.

In some of these cases, owing to peculiar provisions of the contract, such statements were held to be representations and not warranties; but in those cases it was held that the representations were continuing, and the failure to use the precautions against fire, as represented, would, if material to the risk, defeat a recovery on the policy. *Houghton v. Ins. Co.*, 8 Met., 114, is such a case. The same doctrine was fully recognized by Mr. Justice PAINE in *May v. Buckeye Ins. Co.*, 25 Wis., 291.

An argument against the application of this doctrine to the present case will now be noticed. The following questions and answers are contained in *Blumer's* application for the insurance: "*Lubricating oils.* What kind of oil is used? Whale oil. Will you agree that none shall be used which are mixed with or composed of petroleum, or any kind of earth or coal oils? Yes." It is argued by the learned counsel for the plaintiffs, that because an express stipulation that the insured would not, in the future, use certain kinds of oil, was required in addition to his statement as to the kind he was

using when the application was made, the other statements in the application, in the present tense, as to the precautions then being used against fire, referred only to the time of the application, and not to any future time.

The argument, although not without force, is not satisfactory. The kinds of oil used on the machinery was a matter most vital to the risk, and the assured, out of abundant caution, might well require an express stipulation for the future in respect thereto, without thereby intending to limit the effect of other statements in the application, not accompanied by a like express stipulation for the future. The information sought by the questions in the application, and furnished by the answers thereto, would be valueless if it related only to the time of the application. Of what consequence was it to the defendant to know that persons lodged in the mill when the application for insurance was made, if that precaution might be abandoned immediately thereafter? It seems quite clear that the parties intended, by their contract, that all of the precautions against fire, which *Blumer* stated he was taking when he applied for the insurance, should be continued, notwithstanding an express stipulation for the future was required as to one of these precautions, and not as to the others.

We think the cases above cited contain a correct exposition of the law governing the present case, and that if the statement of the insured, that " one or two hands sleep in the mill," is a warranty, the failure of *Blumer* to continue this precaution against fire defeats a recovery on the policy.

I may be allowed to say further that, in my opinion, the result is the same if such statement be considered a representation merely, and not a warranty; for, as already shown, the representation is promissory and continuing, and must be kept good. The failure to do so, if material to the risk, is equally fatal to a recovery on the policy. That the risk was increased by leaving the mill unoccupied during the night, I cannot doubt, and I think the learned circuit judge did not err in so holding as matter of law. Had he submitted it to the jury to determine whether the risk was thereby increased,

and had the jury determined the question in the negative, the verdict should not be upheld.

There is still another view of this case, which leads to the same result. The application for the insurance was made December 3d, and the policy was delivered to *Blumer* on the 28th of the same month. The delay was caused by the non-payment of the premium. There can be no doubt that, had the property been destroyed before the 28th, the insurer would not have been liable. The contract of insurance, therefore, was not made until the 28th. No person slept in the mill after December 25th. So, when the contract was actually made, it was not true that " one or two hands sleep in the mill." *Blumer* knew that it was not true when he accepted the policy, but failed to inform the insurer of the fact. Now, if it be conceded that the statement that " one or two hands sleep in the mill," is not promissory and continuing beyond the time the contract was entered into, it must be true that it was so until that time. The case would be the same had the delivery of the application and policy been concurrent acts, done on the 28th of December. In contemplation of law they were simultaneous acts, and the insurer delivered the policy on the faith of a false warranty; or, at the very least, on the faith of a false representation material to the risk, and in the belief that it was true. Within the rules of law above stated, whether the false statement is a warranty or a mere representation, there can be no recovery upon the policy. *Traill v. Baring*, 10 Law Times R., 215; *British Eq. Assurance Co. v. The G. W. Railway Co.*, 20 id., 422.

Our conclusion is, that the learned circuit judge properly directed the jury to find for the defendant.

II. The remaining assignments of error will now be briefly considered. They are that the judge erred, 1. In allowing the defendant to amend its answer at the trial, whereby new substantive defenses were interposed; 2. In refusing to allow *Blumer* to testify to statements made by him to the agent of the defendant when he applied for the insurance; and 3. In

refusing to allow the plaintiffs to show that *Blumer* did not see the policy before he paid the premium.

1. The statement of *Blumer* in reply to the question concerning a watchman is set out, and its truth denied, in the original answer of the defendant. Inasmuch as our judgment goes upon the falsity of that statement, it is quite immaterial whether the amendments (which related to other breaches of the contract) were properly allowed or not. An examination of the pleadings satisfies us, however, that the allowance of the amendments was not error.

2. The testimony sought to be elicited from *Blumer*, and ruled out by the court, related to statements made by him to the agent of the defendant in respect to the mode of ascertaining the value of the property proposed for insurance, and had no reference to the subject of precautions against fire. Under the circumstances of the case, we think it quite immaterial whether the ruling was right or wrong. If erroneous, the ruling could not affect the judgment, and hence would not work a reversal of it.

3. It is also immaterial whether *Blumer* saw the policy before he paid the premium. He saw it when it was delivered to him, and then had an opportunity to examine it. If it did not state the contract correctly, he had his remedy. But it is not claimed that the contract is incorrectly stated therein. Moreover, the stipulation in the contract which controls our judgment, is not in the policy proper, but in the application, of the contents of which *Blumer* testified he had full knowledge.

The judgment of the circuit court must be affirmed.

TAYLOR, J. The policy of insurance upon which this action was brought, is one of a number which were issued at the same time, and upon similar applications, amounting in all to the sum of $22,500, upon a flouring mill and machinery owned by the plaintiff *Blumer*. The case is one, therefore, of considerable importance to the defendant, and of the highest im-

portance to the plaintiffs. As to the plaintiff *Blumer*, it involves the accumulations of a lifetime of labor; and to the plaintiff *Bliss* it involves the amount of $7,000 loaned upon the security, and faith in the validity, of these insurance policies. The case is one which deserves the most careful consideration of this court, if viewed only as affecting the interests of those personally connected with it; but it is of far greater consequence that we establish a rule of law applicable to all policies containing similar provisions to the one in question, which will not unjustly jeopardize the rights of hundreds of other policy holders, who have paid their money for the promised protection of an insurance upon their property.

The learned judge of the circuit court directed a verdict for the defendant, solely upon the ground that the plaintiff *Blumer* had violated one of the conditions upon which his policy had been issued, holding that he had in his application promised upon his part, that he would, during the currency of the policy, have one or two of his hands sleep in the mill at night. Upon the trial, the evidence showed that for three or more weeks before the fire which destroyed the mill, none of the plaintiff's hands had slept in the mill. After carefully considering this case, and after an extended examination of the authorities, I cannot assent to the conclusion arrived at by the learned circuit judge.

To understand the question fairly, it will be necessary to examine with some particularity the terms of the application upon which the policy was issued, as well as the policy itself. The application was a printed form, prepared by the defendant company, containing printed interrogatories to be answered by the assured. In this case, the answers were written by the agent of the company; and, as the assured was a German and not able to write well, especially in English, his name was signed to the application by the agent, at the request of the assured. The application, after giving the location and value of the mill, proceeds with a number of questions in relation to the machinery and the manner in which it was run, speed, and how the dust from the smut machine was disposed of. Then,

under the head of lubricating oils, are the following questions: "What kind of oils are used? Ans. Whale oil. Is the machinery regularly oiled, and by whom? Ans. Yes; by one of the millers. *Will you agree that none shall be used that are mixed with or compounded with petroleum or any kind of earth or coal oils? Ans. Yes.*" Next are questions under the head "For extinguishing." "What are the facilities for extinguishing fires? *Ans. Gardner's Fire Extinguisher. Is there water, force pump, hose, casks or buckets? Ans. Two barrels and about six buckets in the mill.*" Then come questions as to how the mill was warmed, and what stoves were used, and what was done with the ashes. In answer to these questions there is an inconsistency, probably arising from a want of clearly understanding the question. The question how the mill is warmed, is answered: "By one stove." The question immediately following is: "If by stoves, state how many, and of what kind; are they sound and in good order?" Ans. "One, and one in the sleeping room, sound and in good order." Next follows, under the head of "Watchman," two questions, the answer to which is relied on as a continuing warranty for the violation of which the policy is forfeited. The questions are: "*Is there a watchman in the mill during night? Is the mill ever left alone?*" To these questions there is but one answer, as follows: "*No regular watchman; but one or two hands sleep in the mill.*" At the end of the application, is the following in writing: "And the said applicant hereby covenants and agrees to and with said company, that the foregoing is a full, true and just exposition *of all the facts and circumstances, condition, situation and value of the property to be insured, and is offered as a basis of the insurance requested, and is made a special warranty, the same as if written on the face of the policy.*"

This application was never in the hands of the assured, but was forwarded to the company and retained by it; and, about twenty-five days afterwards, the policy was delivered to the plaintiff. The agent wrote a letter to the company with this application, in which he states: "I went out to *Mr. B.'s*

place on the evening of the 2d, and spent nearly the whole of yesterday in inspecting his property, embracing 120 acres of land, two barns, two dwelling houses, one store and the mill. It is a splendid mill, with all the modern and improved machinery therein. The only objection I found, was the use of a stationary kerosene oil lamp; candles being generally used around the mill. Seldom do any night work; but objected to the use of lamp, and *Mr. B.* said he would not use it. The first year it was built, it was insured, as *Mr. B.* borrowed some money to complete it; but since, until the present time, it has been without insurance. *Mr. B.* says he has indebtedness of about $6,000 to different parties, and is trying to get about $10,000 of one party to pay up these claims, and then give a mortgage upon his whole property, and make policies payable. This is one inducement for his insuring. All seems O. K."

The policy, amongst an almost endless number of stipulations, conditions and special clauses, contains the following, which are the only ones having any particular bearing on the questions involved in this case. "*First.* If any application, survey, plan or description of the property herein insured is referred to in this policy, such application, survey, plan or description shall be considered a part of this contract, and a warranty by the assured, and any false representation by the assured of the condition, situation and occupancy of the property, or any omission to make known every fact material to the risk, or any overvaluation, or any misrepresentation whatever, either in a written application or otherwise, or if the assured shall have, or shall hereafter make any other insurance (whether valid or not) on the property hereby insured, or any part thereof, *or if the above mentioned premises shall be occupied or used so as to increase the risk,* or become vacant or unoccupied, and so remain without notice to and consent of this company in writing, *or the risk be increased by the erection, or occupation of neighboring buildings, or by any means whatever within the control of the assured, without the assent of this company indorsed hereon, or if it be a manufacturing*

establishment, running, in whole or in part, over or extra time, or running at night, or if it shall cease to be operated without special agreement indorsed on this policy, . . . then and in such case this policy is void."

As to the manner in which the application was made out, Rodolph, the agent, testifies as follows: "My impression is, that this application was written in *Blumer's* store; a portion of it was written in lead pencil when Miller was present, and then I went to the store and wrote it over in ink, and then I had a talk with *Blumer* in reference to it. *I made out the policy on the 4th, and held it until the 28th.*" *Blumer* says in regard to the application: "*The answers in the application were not read over to me by Rodolph. I cannot read English. I did not attempt to read this paper after it was completed.* The question: '*What are the facilities for extinguishing fire; is there water, force pumps, casks or buckets?*' *was not made to me, neither did I answer to that question, '* Gardner's *Fire Extinguisher, two barrels or about six buckets kept in the mill.' I didn't know that statement was in the application when I signed it. I told Rodolph there was no water except in the bulk-head.*"

The witness Lamech Graham says: "I was there at the mill twice when he, Rodolph, came to take insurance. I went through the mill; he visited all parts of the mill from top to bottom; he examined with me the machinery of the mill." He further testified, on his cross examination: "*When him* (meaning Rodolph) *and me went through, he put down the machinery and the motion of the smutter, and the kind of smutter, and the speed of all the machinery. Rodolph directed me to go through the mill. Blumer* was at home. After Rodolph went out of the mill, I went over to *Blumer's*. I guess he had a pencil and a piece of paper, or a book. *The sleeping room in the mill was located in the third story, counting the basement one story, in the southwest corner of the building. It was on the bolting floor. The coopers were sleeping in the mill at the time Rodolph was there; I don't know how long they continued.*"

What was sworn to by *Blumer* and his witnesses, was not controverted by the agent, Rodolph. We must therefore conclude that the application was made out in about the way *Blumer* and his witnesses testify.

I have been thus careful to show the manner of making the application, as it has some bearing upon the question of how the statements made therein shall be construed. If the assured by that application made a contract of warranty as to the future in regard to the hands sleeping in the mill, and such grave consequences are to result from its breach, all the circumstances which surrounded the parties at the time the same was entered into ought to be considered, and carefully weighed, for the purpose of ascertaining the probabilities as to whether the contracting parties understood at the time that the words used made such a contract. After the loss, and, I judge from the manner in which the case was tried, after a failure of the company to avoid the contract on the ground of fraud on the part of the assured in overvaluing the premises, and in causing their destruction by the commission of arson, this part of the application, made in the careless manner the evidence shows it was made, made in fact by the agent of the company, using evidently his own language, is relied upon for the purpose of avoiding the policy upon the strength of a claimed technical warranty, in regard to a matter which at the time was evidently treated as a matter of no consequence, and which had little if any influence, either one way or the other, in fixing the character of the risk, or in enhancing the amount of premiums to be paid therefor. It is but just, therefore, that the insurer claiming such forfeiture should be required to make out a clear case in his favor, viewed in the light of all the circumstances surrounding the same.

If an insurance company may so contract with the parties whom it deludes with the promise of insurance, and of whom it receives an adequate compensation for all the risks incurred, that it can refuse to pay, if any statement, however immaterial to the risk, is a misstatement, without showing that any injury could or did accrue to the company therefrom; if they

can so contract as to avoid the obligation to pay in case of loss, without giving any reason why, except that it is so agreed (and this is of the very nature of a warranty, in an insurance policy), there is every reason to require the company making such claim to show, beyond any question or cavil, that such is the contract. No presumption can arise in favor of such agreement, except what necessarily arises from the language used; and every doubt weighs against it. This should be so, because the contract so construed works a forfeiture, and permits the insurer to avoid the policy and refuse payment, however honest the loss may be, without any proof that the breach of the supposed warranty contributed in any way to the loss, or in any way damaged the company. Warranties in insurance policies are strictly in the nature of penalties and forfeitures. A breach forfeits the whole sum which would be payable; and no proof, however clear and satisfactory, that there was no bad faith, or that no damage could have followed from the breach, can in the least mitigate the loss to the assured.

This court has in several cases, following the precedents of the most learned courts of the civilized world, declared most emphatically that a party seeking to enforce a forfeiture or penalty can only do so, in case of a forfeiture, when there is no other reasonable construction to be given to the contract; and this is especially so when the forfeiture grows out of the breach of a condition subsequent; and that, when it is sought to enforce a penalty, its enforcement will be refused unless the court can see that the thing to be done, or omitted to be done, by the party of whom the penalty is claimed, is necessarily injurious to the party claiming it, to a degree corresponding to the amount demanded as the penalty; and it almost always limits the recovery to the amount of damage which is actually sustained by the party claiming it. *Lawe v. Hyde*, 39 Wis., 345; *Lyman v. Babcock*, 40 id., 503.

The first case was one involving the construction to be given to a deed of real estate, which was claimed to contain a condition subsequent, upon the breach of which the title was to revert to the grantor and his heirs. The learned chief justice,

upon the question of construction in such case, says: "The rule of construction is old, certain and uniform. '*Conditio beneficialis, quæ statum construit, benigne, secundum verborum intentionem est interpretanda; odiosa autem, quæ statum destruit, stricte, secundum verborum proprietatem, accipienda*' (*Fraunces*' *Case*, 8 Rep., 89 b., Co. Lit., 218 a); 'as strictly as the words of any penal statute,' as said in *Rungun v. Fogosse*, 1 Plowd., 1; *Jackson v. Silvernail*, 15 Johns., 278; *Hadley v. Hadley*, 4 Gray, 140; *Morse v. Ins. Co.*, 30 Wis., 534." See, also, *Osgood v. Abbott*, 58 Me., 74; *Hooper v. Cummings*, 45 id., 359; *Moorefield v. Albright*, 4 Cush., 178.

The case of *Lyman v. Babcock* was one involving the construction of a contract in which it was claimed that the defendant had promised to pay a gross sum as liquidated damages. The learned chief justice in that case says: "When the sum is agreed to be paid for any of several breaches of the contract, and the damages resulting from all of them are uncertain, and there is no fixed rule for measuring them, but the breaches are apparently of various degrees of importance and injury, the cases are conflicting in the rule, whether the sum should be held as a penalty or as liquidated damages.

"On principle, we are very clear that in such case the sum should be held as a penalty. For it appears to us that it would be unjust to sanction a recovery for the sum agreed to be paid, alike for any one trivial breach, or for any one important breach, or for a breach of the whole contract, as it would be to sanction such a recovery equally for damages certain and uncertain in their nature."

It is unnecessary to multiply authorities to show the reluctance with which courts permit the enforcement of conditions subsequent which create forfeitures, or enforce claims for the forfeiture of specific sums as damages, for the breach or breaches of a contract. Even when parties have solemnly agreed that in a case of a breach the damages to be recovered shall be a certain fixed amount, the courts refuse to allow the rule of assessment of damages to be the one fixed by the

parties, and compel them, notwithstanding their agreement, to abide by the more equitable one established by the courts, viz., that a party injured shall only recover according to the extent of his injury as ascertained by the court and jury.

In cases of insurance policies containing what are called warranties, contrary to the rule above established as to penalties in other cases, the courts uniformly hold that every breach, no matter how trivial, or how improbable that any damage could result therefrom, must in effect entitle the insurance company to a verdict for the whole amount insured, whether it be one hundred or ten thousand dollars. When consequences of so serious a nature are to follow any breach of a contract, it is just and right that courts should hold that such contract must be so clearly expressed that there can be no reasonable excuse for giving it a different construction.

The same rules of construction applied to contracts containing conditions subsequent creating forfeitures and providing for penalties, are applied to contracts of insurance which are sought to be avoided for a breach of warranty. All the books hold this, and there is the utmost propriety in doing so.

"When the intent is doubtful, conditions providing for forfeitures are to be construed strictly against those for whose benefit they are intended." *Morse v. Ins. Co.*, 30 Wis., 540.

"The party to a contract, who seeks to destroy its obligation by reason of an alleged breach of a condition precedent by the other party, cannot establish the existence of such condition by inference or conjecture; the terms of the contract must be clear and explicit in his favor." *Clinton v. Ins. Co.*, 45 N. Y., 454-464.

In the case of *Hoffman v. Ins. Co.*, 32 N. Y., 414, Justice POTTER, in delivering the opinion of the court, says: "The appellants also encounter another rule, equally at variance with the proposition they seek to maintain: conditions providing for disabilities and forfeitures are to receive, *when the intent is doubtful, a strict construction against those for whose benefit they are introduced.*"

The same rule is laid down in *Livingston v. Stickles*, 7 Hill,

255; *Catlin v. Springfield Ins. Co.*, 1 Sum., 434; *Breasted v. Farmers' Loan and Trust Co.*, 4 Seld., 305; *Yeaton v. Fry*, 5 Cranch., 341.

Another rule of construction must be applied to this contract. The contract is throughout, both in the application (as is clearly shown in this case) and in the policy, in the language of the defendant, and prepared with deliberation in all its detail. In such case, the rule is, that the contract must be construed liberally in favor of the party whose language does not enter into the contract. Chief Justice MARSHALL, in applying this rule to a marine insurance policy, says: "The words are the words of the insurer, not of the insured; and they take a particular risk out of the policy, which, but for the exception, would be comprehended in the contract." *Yeaton v. Fry*, *supra.* As long ago as 1757, LEE, Chief Justice of the King's Bench, said of insurance contracts, " that, in the construction of policies, the *strictum jus*, or *apex juris*, is not to be laid hold on, but they are to be construed largely for the benefit of trade, *and for the insured.*" 1 Burrow, 349. In the case of the *National Bank v. Ins. Co.*, 5 Otto, U. S., 678, the court say: "But without adopting either of these constructions, we rest the conclusion already indicated upon the broad ground, that when a policy of insurance contains contradictory provisions, or has been so framed as to leave *room for construction*, rendering it doubtful whether the parties intended the exact truth of the applicant's statements to be a condition precedent to any binding contract, *the court should lean against the construction which imposes upon the insured the obligations of a warranty.* The company cannot justly complain of such a rule. Its attorneys, officers and agents prepare the policy, for the purpose, we shall assume, both of protecting the company against fraud and of securing the just rights of the assured under a valid contract of insurance. It is its language which the court is invited to interpret; and it is both reasonable and just that its own words should be construed most strongly against itself." Keeping in mind these general rules of construing contracts of insurance containing warranties,

I think it clear that there was no warranty in this contract, that the plaintiff would, during the currency of the policy, keep one or more men sleeping in the mill at night.

To construe it a continuing warranty, is to construe it against its literal and grammatical sense.

Certainly there is nothing in the questions which relates to the future. Both questions ask for information as to the present, and especially the question as to watchmen. The questions are: " Is there a watchman in the mill during the night? Is the mill ever left alone?" The answer is: "No regular watch-man, but one or two hands sleep in the mill."

It is argued, that there would be no sense in a question or questions of this kind unless they related to the future, and unless the company intended that the answers should extend to the future. I think there would be many good reasons why an insurance company should ask these questions, even though it had no intention of binding the party to future action. It is always important to an insurance company to know the care which the insured bestows upon his property. If he has a careless and reckless manner in regard to the use of his property, the company have an interest in knowing it. It has an interest in knowing the character and habits of the insured as a business man and otherwise. This application contains many questions relating to the mill, equally, and to my mind much more important to the company than the fact that men slept · in it, to which answers were given, which this court would not and could not construe into continuing warranties. Take as an instance the motions of the machinery, and the kind of smutter used in the mill; yet it would not have been a breach of warranty, if a change had been made either in the motions of the machinery, or in the smut machine, or in the motions of the mill stones. These changes in the future would only have avoided the policy in case the risk had been thereby increased.

Suppose there had been the direct question, " Do any persons sleep in the mill?" and the answer had been " No." I do not think this or any other court would have held that to

have been a continuing warranty, and that the policy would have been avoided if any one had slept in the mill during its currency; because the assured could not tell from the question alone, whether the insurer considered it material to the risk that no person should sleep therein. The rule in such case would be to bring the change of occupation in that respect under the clause which provides that any change which materially increased the risk should avoid the policy.

It would undoubtedly be a present warranty of its truth, and might avoid the policy if not then true; not because the fact was material to the risk, but because the parties had chosen to make it a part of the contract that the policy should not attach if the statement was untrue.

If the question, "Is there a watch nights?" had been answered "No," that would not, in my opinion, have been a continuing warranty, because the parties in that case would not be likely to understand that there should be no watch in the future. The question, therefore, in construing an interrogatory and answer into a continuing warranty, or otherwise, is a question of what was the intent of the parties at the time; and when. the intent is to be drawn from the writing alone, the intent that it was to be a continuing one will not be found, unless it be clear that both parties so intended it, or unless the contract so expressly provides. This is the utmost extent to which any of the cases go, which have been cited by counsel to sustain the ruling of the learned circuit judge on the trial of this action.

None of the cases go farther than this, that when a question relates to the manner of using a mill or other manufacturing establishment, or to the precautions taken against fire, and the answer is affirmative or negative, and the court can determine from the answer, as a matter of law, that the continuation of the custom or use, as the answer shows it to be, will lessen the risk, such answer will generally be held to be a continuing warranty; but when the custom or use is such that the court cannot say, as a matter of law, that its continuance will necessarily lessen the risk, it will not be held to be

a continuing warranty, unless it be expressly so agreed in the contract.

Very many cases hold a still more strict construction against the insurance companies, upon the question of continuing warranties, than as stated above.    See *Blood v. Ins. Co.*, 12 Cush., 472; *Schmidt v. Ins. Co.*, 41 Ill., 295; *Aurora Ins. Co. v. Eddy*, 55 id., 213; *P. L. Ins. Co. v. Fennell*, 49 id., 180; *N. E., etc., Ins. Co. v. Wetmore*, 32 id., 223; *Smith v. Ins. Co.*, 32 N. Y., 399; *Catlin v. Ins. Co.*, 1 Sum., 435; *O'Niel v. Ins. Co.*, 3 N. Y., 122.

In the case of *Schmidt v. Ins. Co.*, 41 Ill., 295, Judge LAWRENCE, in giving the opinion of the court, remarks: " It is a question upon which the authorities differ; but, in view of the fact that the insurance company dictates the language of its own policy, which is therefore to be most strongly construed against it, and can, if they wish, insert a stipulation which in terms refers to the future use of the property, and do, by an express provision in this, as we presume in all policies, relieve themselves from all liability in case the risk is actually increased, we are inclined to adopt the ruling of the cases which hold that these words are to be construed in reference to the then condition of the property."

In the case of *Blood v. Ins. Co., supra*, Justice BIGELOW says:    " But a more decisive and satisfactory indication of the intent of the parties to limit the warranty to a description of the property *as it was at the inception of the contract, and not to extend it to the mode of its future use and occupation, is found in the fact* that there was an express agreement by which the defendants protect themselves against any increase of risk in consequence of a change in the situation or circumstances of the property.    This leaves no room for doubt that the sole object of the warranty in question was to ascertain the precise nature and condition of the property at the time the risk was proposed to the defendants in the application of the plaintiff, and to enable them to judge of its extent and character and the rate of premium at which they would insure it. But it is clear that they did not rely upon it as an executory

stipulation, by which the plaintiff was to be bound after the contract was entered into. To guard against any increase of risk which might arise from any change in the structure or use of the property, they relied upon a special agreement designed for that purpose only. If they relied on the warranty, such an agreement was superfluous and useless. In order, therefore, to give effect to both clauses in the contract, it is necessary to construe the warranty as being affirmative only, and not intended to apply to the future condition of the property." In this case, the question and answer which it was claimed by the insurance company constituted a continuing warranty, were as follows: "For what purposes occupied?" Answer: "Formerly used as a machine shop, all of which business is now stopped, and shop fastened up, and only used for the purpose of the meeting of the band during two evenings of the week, on second floor." On the trial, the insurance company offered to show that the building had been used for other purposes during the continuance of the risk, and contended that, whether such change of occupation did or did not increase the risk, it was a breach of the warranty; the evidence was rejected; and the supreme court, on appeal, affirmed the ruling of the trial judge.

In the case of *Schmidt v. Ins. Co., supra*, the policy itself contained the following statement: "No fire in or about the building, except under kettle securely imbedded in masonry (and used for heating water), and made perfectly secure against accidents." At the time of the loss, it was proved there were two stoves in the building, in which fires had been kept during the currency of the policy and before the loss. The buildings insured were a tannery and bark mill.

In *Ins. Co. v. Eddy, supra*, it was insisted that the policy contained a warranty that no stoves should be used in a building insured as a flax factory. The application contained the following questions and answers: "How is the building warmed? If any stoves and pipes, how are they secured?" To this it was answered: "No stoves used." The insured agreed in the application, if any untrue answer was given

therein, the insurance was to cease, and the policy to be of no effect. After the policy was issued, a stove was used in the building for warming it. The company insisted there was a breach of the warranty that no stoves should be used for warming purposes. The court said, approving the case in 41 Ill., *supra:* "The use of the stove was not a breach of the warranty; but if used recklessly, it might be re-garded as increasing the risk." This was a very strong case against construing the statement of the insured into a continu-ing warranty. The building insured was a flax factory; the fact as to whether it was warmed by a stove or not was of peculiar importance; and the evidence on the trial tended strongly to show that the fire was probably caused by the use of the stove. The case, in all its aspects, presented a much stronger one in favor of the insurance company than the one at bar.

*Smith v. Ins. Co.*, 32 N. Y., 399, is a strong case against the construction given to the policy in this action. In that case, the policy itself contained a statement that the building insured "was used for winding and coloring yarn, and for stor-ing spun yarn." This, the court say, "was undoubtedly a warranty of its then present use, and it was true at the time the insurance was made." Pending the running of the policy, the use was changed, but it was not proved that the change increased the risk. The court below nonsuited the plaintiff, holding the statement above cited a continuing warranty. Justice DAVIS, who delivered the opinion in the court of appeals, says: " A distinction was made in the court below between the use of the word 'occupied' and the word 'used,' in the description of the policy, as to the effect on the ques-tion of continuing warranty; but to my mind the suggestion is without force. Both relate to the present actual use of the property, and are, when so applied, synonomous in intent and meaning. If the courts do not find a warranty in the phrase ' occupied in a particular manner,' it would be overstraining to find one in the words 'used in a specified way.' If an insurance company desires to protect itself by a warranty

*as to future or continuing use in the same manner as when insured, it may always do so by language the object and meaning of which will be understood by both parties; and the courts should not construe words which are fully satisfied as a description of a present use or condition, into a promissory warranty, unless the inference is natural and irresistible that such was the design of both parties.*"

In the case of *Catlin v. Ins. Co.*, 1 Sum., 442, Justice STORY says: "Suppose a policy against fire underwritten on a house of A. in Boston, described as a dwelling house, or as occupied as a dwelling house: would the policy be void if the house should cease for a time to have a tenant? Such a doctrine has never, to my knowledge, been asserted, nor should I deem it maintainable."

In *Power v. Ins. Co.*, 8 Phila., 556, the following questions and answers were in the application: "Is a watch kept on the premises? Is there a good watch clock? Is any other duty required of the watchman than watching for the safety of the premises? Is the building left alone at any time after the watchman goes off duty in the morning, till he returns to his charge in the evening?" To these several questions the plaintiff made but one answer. "There is a watchman when the mill is not in use." The policy contained the clause making the application a warranty.

The judge, in commenting upon these questions and answers, says: "I cannot say that the answer was intended by the parties as a contract that the insured should always keep a watchman at the mill when it was not going, and that his sole duty during such times should be to watch against fire, always awake and always present; nor can I say that the law constructs such a contract out of the answer. The answer is very loose in its terms, and the insurers accept it in all its looseness, and then as of little importance, and do not insert it in the policy for further guidance, but file it away in their office. It makes no approach to a definition of the functions to be performed by the watchman." The remarks of the learned judge in this case will apply with equal and greater

force to the case at bar. Here the answer negatived the fact that any watchman was kept, and gave an answer not directly responsive to the question, which was accepted as sufficient by the insurer, inserted in the application by its agent, sent to its office and filed there, considered at the time of no importance, and only brought to the knowledge of the insured as being of any importance, when it is used on the trial to defeat his policy.

In the case of *Boon v. Ætna Ins. Co.*, 40 Conn., 586, the court says: "To this it should be added that it is the duty of an insurance company seeking to limit the operation of its contract of insurance by special provisions or exceptions, to make such limitations in clear terms, and not leave the insured in a condition to be misled. The uncertainties arising from provisos, exceptions, qualifications and special conditions in or indorsed upon policies have been often condemned; and such special modifications are justly characterized as traps to deceive and catch the unwary. An insured may be reasonably held entitled to rely on a *construction favorable to himself, when the terms will rationally permit it.* Where, as in this case, such construction gives a signification *ejusdem generis* with all others with which it is found associated, and in harmony with the general character and purpose of the provisions in which they are found, he is clearly entitled to insist on such construction."

*Benham v. The United Guaranty & Life Assurance Co.*, 7 Exch., 744. In this case the policy recited that, as the basis of the contract for such guaranty, the plaintiff had lodged at the office of the defendants a certain statement in writing, containing a declaration, signed by the plaintiff, of the truth of the answers thereby given to the questions therein contained. Among the questions put, were the following: "Checks which will be used to secure accuracy in his accounts, and when and how often they will be balanced and closed." Ans. "Examined by finance committee every fortnight." The policy guarantied the integrity of the secretary of a literary institution; and the loss occurred by reason of the omission to

AUGUST TERM, 1878.          649

Blumer and another vs. The Phœnix Ins. Co.

examine the accounts in the manner stated. POLLOCK, C. B., in deciding the case, says: "The manner in which this question is put, the other questions with which it is associated, and the decisions upon policies of insurance, lead me to the conclusion that the answer was not expected to be upon the part of the office, or meant to be on the part of the plaintiff, anything more than a declaration of the course intended to be pursued; and if that answer was made *bona fide* and honestly, it does not prevent the plaintiff from maintaining this action." The chief baron, on the argument, gives this reason for his conclusion: "Suppose that, instead of examining the accounts every fortnight, the institution had adopted, as a more convenient mode of securing the fidelity of the secretary, the practice of sending the money every day to a banker, and that on one occasion, when some was left, the secretary had absconded with it: would the policy be avoided? If it is a warranty, it must be construed strictly; and therefore, although the institution had found out a better mode of checking the accounts, they would nevertheless be obliged to go through the idle ceremony of having them examined by a finance committee."

This case illustrates in a clear manner the obstinacy with which courts resist a construction of a contract of insurance, which will create a warranty as to future conduct, even in matters of vital importance to the insurer, and shows that in that court, at least, nothing but the most clear and explicit language will be held sufficient to create such warranty.

The foregoing cases and the following all show that the courts uniformly refuse to give a construction to a policy of insurance which will create a continuing warranty, unless the terms of the contract are so explicit that it is not susceptible of any other reasonable construction. *Parker v. Ins. Co.*, 10 Gray, 302; *W. M. Life Ins. Co. v. Shultz*, 73 Ill., 586; *Gilliat v. Ins. Co.*, 8 R. I., 282; *Gates v. Ins. Co.*, 5 N. Y., 469; 2 Hall (N. Y.), 602; 14 Barb., 545; *Peoria M. & F. Ins. Co. v. Lewis*, 18 Ill., 553; *Provident Life Ins. Co. v. Fennell*, 49 id., 180; *May v. Ins. Co.*, 25 Wis., 291; *Stout v. Ins. Co.*,

12 Iowa, 371; *U. S. F. & M. Ins. Co. v. Kimberly*, 34 Md., 224; *Williams v. Ins. Co.*, 31 Me., 219; *Cumb. V. Mut. Pro. Co. v. Schell*, 29 Pa. St., 31; *Frisbie v. Ins. Co.*, 27 id., 325. It would be a waste of time to cite the cases in this court for the purpose of proving that it has been the uniform rule to construe contracts of insurance liberally in favor of the insured, and strictly against the companies, in all cases where it was claimed that a forfeiture had occurred in favor of the company; and the cases above cited show conclusively that the rule adopted by this court is amply sustained by the course of decisions of the highest and most learned courts both in this country and in England. To show that the exception to the rule by the decision in this case is not intended to be a new departure by this court, I refer to the cases of *Palmer v. The St. Paul Fire & Marine Ins. Co.; Erdmann v. The Mutual Life Ins. Co. of the Order of Herman's Sons;* and *Schunck v. Gegenseitiger Wittwen und Waisen Fund*, decided since the opinion of the majority of the court was written in this case. 44 Wis., 201, 369, 376.

The cases cited on the part of the respondent, to sustain the decision of the learned circuit judge, though some of them may conflict with the decisions above cited, and especially with those cited from the supreme court of Illinois, none of them go the length necessary in order to construe the answer of the plaintiff in this case into a continuing warranty.

In the case of *May v. Ins. Co.*, 25 Wis., 304, the interrogatory and answer were both very clear and specific. The question was, " Have you a night watchman always on duty?" And the answer was, " We have." The late Justice PAINE says: " Both the questions and answers in such cases purport to relate only to the then existing condition of things. Notwithstanding this, it is entirely reasonable and just to say, that, in respect to those things that, according to the usual course of the business, are permanent and continuing, the parties intend to agree that they shall be kept in the same condition. The assured undertakes to make no changes in the

condition or the mode of using them, outside of the usual mode of conducting the particular business."

In the case at bar, irrespective of the fact that there was no inquiry made of the plaintiff as to whether any persons slept in the mill, and therefore he could have no means of knowing whether the company considered that fact material, it can hardly be said that one or two hands sleeping in the mill had anything to do with conducting the business of the mill. It was so occupied, probably, for the convenience of the hands working in the mill, as well as for the convenience of the mill owner. It was not a method of carrying on the business, nor was it apparent that it was done for the protection of the mill in any way. The fact was, as the proof shows, that the men sleeping in the mill were coopers, who had nothing to do with the running of the mill in any way.

In the case of *The Bank v. Ins. Co.*, 50 N. Y., 45, the question was also direct, and the answer responsive. The question was, "*Watchman*. Is one kept in the mill or on the premises during the night, and at all times when the mill is not in operation, or when the workmen are not present?" Ans. "Yes." In *Glendale Manufacturing Co. v. Ins. Co.*, 21 Conn., 19, the questions were: "Is there a watchman in the mill during the night? Is there a good watch clock? Is the mill left alone at any time after the watch goes off duty in the morning, until he returns at evening?" Ans. "There is a watchman nights. No clock. Bell struck every hour from eight o'clock P. M., till it rings for work in the morning." In *Ripley v. Ætna Ins. Co.*, 30 N. Y., 136, the questions and answers were equally specific and responsive.

In *Houghton v. Ins. Co.*, 8. Met., 114, the questions were "Is a watch kept constantly in the building? If no watch is constantly kept, state what is the arrangement respecting it." Ans. "No watch is kept in or about the buildings, but the mill is examined thirty minutes after work."

The court in this case held, *that, as the examination was manifestly intended as a substitute for a constant watch;* as it was one which the assured had it in their power to make or

cause to be made; as it was one of the precautions tending to secure the property against danger by fire, and tending to its safety — it was one which, as a general practice, the assured were bound to follow. In the case in 9 Gray, 27, and 2 Comst., 210, the contract in express terms related to the future, and did not depend upon construction. It does not seem to me possible that the court can say, from reading the questions propounded and the answer given in this case, and considering all the circumstances attending the making of the application, the nature and extent of other questions propounded and answered at the same time, the fact that the mill insured was a water-mill, and that the company did not propound any interrogatory which would necessarily call for the answer given, that the questions and answer relied on was, in the language of the court in the case of *Houghton v. Ins. Co.*, *supra*, " manifestly intended as a substitute for a constant watch; " or, in the language of the court in the case of *Smith v. Ins. Co.*, *supra*, that " the inference is natural and irresistible, that such was the design of the parties." And, unless they can be so construed, there can be no pretense that they constitute a continuing warranty. To give them such a construction, is to construe the words most liberally in favor of the insurance company, which is contrary to the fundamental rule of construction when applied to warranties, either precedent or subsequent, in policies of insurance. There is lacking in this case an element which was controlling in the case of *Houghton v. Ins. Co.* In that case, the second interrogatory was: " If no watch is constantly kept, state what is the arrangement respecting it." The answer was directly responsive to this question. Both parties understood that the arrangement mentioned in the answer was in place of a watch. In this case no such question is put. The company contents itself, so far as we can see from its inquiries, with ascertaining whether there was a watch during the night; beyond that, it is not inquisitive. If there be a watch, it is well; if there be none, it is equally well, we are at liberty to suppose, because they make no further inquiry. How, then, can the

court say that the company relied upon men sleeping in the mill as a substitute for a watch, or that it deemed that fact material?

Many cases hold, and perhaps properly, that when an insurance company makes special inquiries concerning matters relating to the subject of insurance, such matters are to be deemed material to the risk; and the courts so hold, not because they are manifestly material, but because the insurance company have the right to say what shall be deemed material to the risk, and when they make the existence of a fact or custom material by a direct inquiry to which they require an answer, the insured is not at liberty to dispute its materiality. 1 Phillips on Ins., § 542; 1 Arnold on Ins., 515, 518. "The proposing of a specific inquiry, and requiring an answer thereto as part of the basis upon which the contract is to be entered into and the risks assumed, shows that the underwriter seeks for information by which his judgment shall be guided, or at least affected and influenced, in determining whether he will issue the policy."

In *Strong v. Ins. Co.*, 10 Pick., 40, the insurance company sought to avoid payment on the ground that there was a mortgage on the insured property, which was not disclosed at the time the policy was issued. But the court held that the insured was not bound to disclose the matter, in the absence of any inquiry upon the subject by the company, and said, "that if it was, in the opinion of the underwriters, important and material to the risk to ascertain the nature of the interest intended to be protected by the policy, it must be presumed they would have inserted in the form of the application an interrogatory to elicit the desired information, thus distinctly implying that a misrepresentation under such circumstances in relation to any matter concerning which information was sought, would be fatal to the validity of the contract." In the following cases it is held that where there is a specific inquiry made in the application, in regard to a particular matter or thing, the answer to such inquiry is material and binds the party insured: *Shoemaker v. Ins. Co.*, 60 Barb., 102; *Draper*

*v. Ins. Co.*, 2 Allen, 569; *Davenport v. Insurance Co.*, 6 Cush., 340; *Patten v. Ins. Co.*, 38 N. H., 338. In these last cases, the courts say: " Where there is a specific inquiry in regard to incumbrances by mortgage, and the answer is positive denying the existence of any mortgage upon the premises, the question of the materiality of the statement in respect to the risk is settled by the parties as a matter of contract. The inquiry itself makes the answer material to the risk, or in effect suggests that the insurer so regards it in fixing their rates of premium, and accepting the risk, and issuing the policy. The question then is not an open one, as one of fact, whether the existence of a mortgage was, or was not, material to the risk." To the same effect are *Ætna Ins. Co. v. France*, 1 Otto, 511; *Jeffries v. Life Ins. Co.*, 22 Wall., 47.

From the foregoing cases we deduce the general rule, that the courts will not presume that the insurer deems any fact, circumstance or custom material to the risk, unless he makes a specific inquiry concerning it. We have a right, therefore, to presume that in this case the insurance company, did not deem the matter of the hands sleeping in the mill or not sleeping there, material to the risk. Had they so deemed it, they would have made inquiry thereof, as a matter necessary to be known, before deciding to take the risk. That the agent noted the fact in the application opposite the questions concerning a watchman, is not sufficient to justify the court in holding that the company considered it material to the risk, and clearly would not justify the court in holding that it deemed it so material that it would hold the insured to a continuance of it, and make it an absolute warranty during the currency of the policy. It seems to me· most unjust to hold that a matter which the company did not deem of sufficient importance, in taking the risk, to make even an inquiry about, should, because disclosed by way of answer to a question to which it was hardly relevant, be construed into a warranty of vital importance to the validity of the policy.

Under the settled rules applicable to insurance contracts, warranties of a continuing kind will not be implied, but it

must be made clear that both parties understood that such was its nature, and such the intention of the parties at the time the same was made. In this case, had the application made specific inquiry upon this subject, the attention of the insured would have been called to it as a thing deemed material by the company, and he would have conducted himself accordingly; but no such inquiry having been made or deemed important by the company, it is unjust to the insured to hold him to a strict warranty in regard to it. That the insured did not understand that the contract bound him to keep men sleeping in the mill, is clearly established by the evidence on the trial. If he is the scoundrel the insurance company now claims him to be, and he had understood that his policy would be void unless he kept men sleeping in the mill, it is impossible to believe that he would have withdrawn the men from the mill before the policy was even delivered to him. To my mind the fact that the insured did not have any men sleeping in the mill, from a time before he received his policy until the fire, is conclusive evidence that he at least did not understand that it was necessary to keep them there in order to keep his insurance good. To give it that construction now, after his property has been destroyed, as we are bound to hold, by accident and misfortune, might justly be characterized as "setting a trap to deceive and catch the unwary." I cannot consent to construe language so uncertain and doubtful, and which is apparently brought into the contract by mere accident, into a contract of such potency that any variation of the slightest nature shall forfeit all claim under the policy. I am strongly inclined to follow the rule laid down by the supreme court of Illinois in the cases of *Ins. Co. v. Eddy* and *Schmidt v. Ins. Co.*, *supra*, that the equivocal expressions in a policy of insurance, whereby it is sought to narrow the range of the obligation the companies profess to assume, are to be interpreted most strongly against the companies. And I fully approve of the remarks of the late Chief Justice Breese, in the case of *Aurora Ins. Co. v. Eddy*, 49 Ill., 106, that "if the underwriters have left their design or object doubtful, by the

use of obscure language [and I would add by any other means], the construction ought to be, and will be most unfavorable to them;" and also the remarks of Justice LAWRENCE, of the same court, in the case of *Insurance Co. v. Robinson*, 54 Ill., 268: "The companies have the preparation of their own policies, the choice of language in which to express their obligations, and they show a studious solicitude to limit their liability. Their policies are prolix with provisions of this character; and the public must accept them or go without insurance. We have no right to censure the companies for this, and do not; but the reading of a policy furnishes a sufficient reason for the rule of interpretation formerly laid down by this court."

I have no doubt that the proper manner of construing a question of this kind is in all cases to construe the meaning as applicable to the present only, unless the contract expressly declares that it shall apply to the future, whenever the company has made no special inquiry as to the fact, or whenever, though inquiry be made, the court cannot, as a matter of law, say that the continuance of the thing would necessarily lessen the risk. None of the cases cited in favor of sustaining the ruling of the circuit judge in this case go farther than is above indicated; and quite a respectable number of cases hold that even in case the inquiry be of a matter the continuance of which would tend to lessen the risk, still, it will not be held to extend to the future, unless the contract so expressly provides.

In this particular case, I would be induced to hold that the warranty would not have been a continuing one, even had the answer been that a watch was kept in the mill nights. I am inclined that way for the reason that the application itself is so drawn that a person dealing with the company might well be led to suppose that it did not intend to hold the insured to a warranty of the continuance of the watch in the future. In the interrogatories concerning the kind of oil used for lubricating the machinery of the mill, the company have put and required an answer to an interrogatory as to the future con-

duct of the insured in respect to the use of such oils.    The company having required the insured to make a written promise as to the continuance of the use of certain lubricating oils in the future, for its protection, and having failed to require any promise as to future conduct in regard to any other matter, the insured might well suppose that the other interrogatories were only put for the purpose of ascertaining the present condition of the mill, and the habits of care of the insured concerning the same.    The kind of lubricating oil used in a water-mill is clearly more material to the risk than the want even of a watch at night, when the mill was not in use. Some of the movements of the machinery of a flouring mill are very rapid, and the danger from heating and fire from that cause is very great; and the kind of oil used is extremely material, as the use of those oils which ignite at a low temperature is very dangerous.    If the company deemed it necessary, in order to bind the party to the use of certain oils in the future, to get an express provision to that effect, it is fairly to be inferred that, if it intended to require a watch in the future as a condition subsequent, it would also have required an express provision for the future in that respect; and more especially if the company had intended to bind the insured by a warranty that some of the hands should sleep in the mill, it would have required such promise.    From the fact that the company, in preparing the application, required a provision for future conduct in regard to a matter which was highly important to its interest, and which, without such provision, would have related to the future as well as to the present, if any of the matters inquired about would have such relation by construction, it would seem that it did not suppose the insured would be bound to a future course of conduct in regard to the subject insured, as a warranty, unless he bound himself by a promise as to the future.    This court is not, therefore, called upon in this case to do that for the company which, at best, it is doubtful whether the company supposed it had secured to itself.

To sustain the judgment of the court below, it must be held

that there was a continuing warranty that men slept in the mill. If there was no promise as to the future relied upon by the company, and understood to be so relied upon by the insured, then the fact that men did not thereafter sleep in the mill could only avoid the policy on the ground that their withdrawal increased the risk, and avoided the policy under one of the conditions of the policy.

Whether the subsequent withdrawal of the men did increase the risk, was a question of fact to be determined by the jury, and not of law for the court. It is unnecessary to cite authorities to this point. The learned circuit judge placed the case upon the ground that the contract contained an agreement to continue the men sleeping in the mill, and that this agreement was either a continuing warranty, or by the contract was made material as a promise of future action on the part of the insured, the nonperformance of which, by the terms of the policy, was to render it void.

In view of the strictness with which this court has heretofore construed contracts, whether of insurance or relating to other matters, against parties seeking to avoid the same on account of alleged breach of conditions subsequent which work a forfeiture, and of the uniform rule of all courts, that all warranties as to the future in insurance policies must be clearly expressed in the contract — that they will not be established by construction, or spelled out by the court, or held to exist unless such be the only natural and reasonable construction which can be given to the language used, — I am unable to find any continuing warranty in regard to the matter upon which the judgment of the court below was based, and am extremely unwilling that the insurance company should escape the payment of this loss upon a mere alleged technical warranty, of doubtful existence, and which does not appear to have in any way contributed to the loss. It appears from the proof in this case, that the agent of the company was fully cognizant of all the facts relating to the property insured; that he made personal and careful examination of the same; that he fully advised the company in regard to it at the time he issued the

policies; that the company was satisfied that the risk was a good one, and accepted it; and, on the trial of this action, the agent swears that in his opinion the risk was a good one. Honesty and fair dealing require that the company should pay, unless they can show that the insured has defrauded them (of which they failed to convince the jury); or unless they can show a breach of a clear and well defined warranty contained in their policy. When they seek to avoid their contract upon this latter ground, they must make a clear case, free from all fair doubts or uncertainties. And it is but just they should do so, because, in that case, they avoid the contract, not because the breach of the warranty has been injurious to them, but simply because it is so stipulated in the contract.

It has been urged that the statement that one or two men slept in the mill was not true as a present fact when the policy was delivered to the plaintiff, and therefore the policy never took effect at all. It would be sufficient to say, in answer to this, that the court below did not direct the jury to find for the defendant upon that theory of the case. Independent of this reason, I think it would be a very gross outrage upon justice to say that the statements made in the application bearing date on the 3d of December, in regard to matters then inquired of as existing or not existing, should be held to be false because they did not exist on a day three weeks thereafter, when the policy was delivered; especially as the policy was in fact issued on the next day after the date of the application, and, when delivered, insured the plaintiff's property from the date of the application. The company having received the premium from its date, and having dated its policy on the day the application was made, and issued it the next day, for the purpose of determining the truth of the statements in the application, they should be referred to the day when made.

I am satisfied that the learned circuit judge erred in directing the jury to find a verdict for the defendant upon the ground stated, and that the judgment of the circuit court ought to be reversed, and a new trial awarded.

*By the Court.* — The judgment of the circuit court is affirmed.

A motion for a rehearing has been granted in this case.