# SUPPLEMENT.

## WILLIAM C. BOON AND OTHERS vs. THE ÆTNA INSURANCE COMPANY.

A policy of insurance, made by the defendants against loss by fire, of goo is of the plaintiffs, in their store in the city of Glasgow, Missouri, contained the usual proviso in such policies, that "the company shall not be liable to make good any loss or damage by fire, which may happen or take place by means of any invasion, insurrection, riot or civil commotion, or of any military or usurped power." At the time of the insurance Glasgow was a military post, occupied by the forces of the United States engaged in the war of the rebellion, and was a depot for military stores, which were deposited in the city hall. In consequence of an attack made by a superior rebel force, the United States military commander, finding that the city could not be successfully defended, and to prevent the stores from falling into the hands of the rebels, ordered their destruction, and, as the only means of effecting it, the city hall was set on fire; whence the fire spread through three intermediate buildings to the store of the plaintiffs, and burned the insured goods. It was conceded that such setting on fire of the city hall by the military power of the United States was the proximate cause of the fire which destroyed the plaintiffs' goods, unless the attack by the rebels was to be so regarded : and that such firing of the city hall was a lawful act and justified by the exigency and the motive for which it was done. Held—1. That the fire which destroyed 'the plaintiffs' goods did not happen or take place by means of the attack by the rebels on the city, nor by means of invasion or insurrection, riot, or civil commotion, within the meaning of the proviso in the policy. The attack by the rebels furnished a motive to the setting on fire of the city hall, but was not the proximate cause of the fire. 2. That the terms "military or usurped power," in the proviso, do not include the lawful acts of the military authorities of the government; but relate to organized unlawful force, acting in hostility to the government or in subversion thereof. A fire caused by the lawful orders of the officer in command of the military forces of the United States would not therefore be within the exception. 3. That the defendants were liable for the loss.

In determining the meaning of one of several terms that are associated in a contract, the maxim "noscitur a sociis" is not conclusive; but, in a case of doubt, and where a like meaning will satisfy the requirements of the general purpose, where there is no other clause or expression hostile to the like interpretation, and especially where other considerations tend to support it, the maxim has especial force and significance.

Where there is an excepting clause in a general and positive agreement, the latter should have effect unless the exception clearly withdraws the case from its operation.

It is the duty of an insurance company seeking to limit the operation of its contract of insurance by special provisos or exceptions, to make such limitations in clear terms and not leave the insured in a condition to be misled. The insured may reasonably be held entitled to rely on a construction favorable to himself where the terms will rationally permit it.

ASSUMPSIT on a policy of fire insurance, brought to the Circuit Court of the United States for the District of Connecticut, and tried, on an issue closed to the court, before *Woodruff*, Circuit Judge, and *Shipman*, District Judge, at the April term, 1874. The facts are sufficiently stated in the opinion.

*F. Fellowes*, for the plaintiffs.

*G. W. Parsons*, for the defendants.

WOODRUFF, J. The facts in this case are not doubtful nor in dispute. The action is brought to recover from the defendant the amount of an insurance against loss by fire upon the goods of the plaintiffs in their store in Glasgow, Missouri, in the sum of six thousand dollars. It is founded on a policy executed by the defendant, dated September 2d, 1864, and the goods were destroyed by fire on the 15th day of October, 1864, within the term of the insurance. The loss was sufficiently great to entitle the plaintiffs to recover, if the defendant is liable at all, the whole sum insured. The plaintiffs have complied with all the terms and conditions of the policy, by the payment of premium, furnishing proper preliminary proofs, and compliance with all other requirements. The policy however contained the following express proviso, annexed to the agreement of insurance, and in the body of the policy, namely:

"Provided always and it is hereby declared, that the company shall not be liable to make good any loss or damage by fire which may happen or take place by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power, or any loss by theft at or after a fire."

The defense herein rests solely on this proviso, and on the facts which are claimed to bring the plaintiffs' loss within its

operation, so as to exempt the defendant from liability under the policy.

At and before the time of the fire in question the city of Glasgow, within which the said store of the plaintiffs was situated, was occupied as a military post by the military forces and portion of the army of the United States engaged in the civil war, then, and for more than three years theretofore, prevailing between the government and the citizens of several southern states, who were in rebellion and seeking to establish an independent government, under the name of "The Confederate States of America."

As such military post, the said city of Glasgow was made the place of deposit of military stores for the use of the army of the United States, which stores were in a building called the city hall of the said city of Glasgow, situated on the same street, and on the same side of the street, and about one hundred and fifty feet distant from the plaintiffs' store, three buildings being located in the intervening space, not however in actual contact with either.

Colonel Chester Harding, an officer of the United States government and in command of the military forces of the United States, held the possession of the city and had lawful charge and control of the military stores aforesaid.

On the said fifteenth of October, 1864, an armed force of the rebels, under military organization, surrounded and attacked the city, at an early hour in the morning, and threw shot and shell into the town, penetrating some buildings and killing soldiers and citizens. The city was defended by Colonel Harding and the military forces under his command, and battle between the loyal troops and the rebel forces continued for many hours. The citizens fled to places of security and no civil government prevailed in the city. The rebel forces were superior in numbers and, after a battle of several hours, drove the forces of the government from their position, compelled their surrender and entered and occupied the said city.

During the battle and when the government troops had been driven from their exterior lines of defence, it became

apparent to Colonel Harding that the city could not be successfully defended, and he thereupon, in order to prevent the said military stores from falling into the possession of the rebels, ordered Major Moore, one of the officers under his command, to destroy them. In obedience to that order to destroy the said stores and having no other means of doing so, Major Moore set fire to the city hall, and thereby the said building with its contents was consumed. Without other interference, agency or instrumentality, the fire spread along the line of the street aforesaid to the building next adjacent to the city hall and from building to building, through two other intermediate buildings, to the store of the plaintiffs, and destroyed the same, together with its contents, including the goods insured by the defendant's policy aforesaid.

During this time, and until after the fire had consumed such goods, the battle continued, and no surrender had taken place, nor had the forces of the rebels nor any part thereof obtained the possession of or entered the city.

Upon these facts, and in view of the before mentioned proviso in the policy of insurance, the question arises,—Is the defendant liable for the loss of the plaintiffs' goods, or does that proviso exempt the defendant from liability?

That question depends upon the answer to be given to some other questions, that is to say:

1. It is insisted that, within the just and proper meaning of the proviso, the fire happened by means of the unlawful and rebellious attack upon the city, by forces acting in assumption of usurped power, endeavoring to capture the forces of the United States, obtain possession of territory in the lawful possession and power of the United States, in aid of the usurped rebel government, and to forcibly accomplish its object and designs; that the fire and therefore the destruction of the goods were a military necessity created by such attack by an illegal armed force, and that so they happened by means of the rebellion and the employment of organized forces to effect the object thereof and the actual attempt of such forces to overcome the authority and government of the United States; that this was therefore the direct or prox-

imate cause of the loss, or, in the words of the proviso, " the means " by which the fire, destroying the goods, "happened."

We think that this reasoning cannot prevail. Fire destroyed the goods. The fire was not communicated to the goods, nor to the building from which it spread, by the rebel forces, nor by any one acting in co-operation with them; nor was it so communicated in any wise in furtherance of the rebellion, its purposes or objects. No act of the rebels, in any physical sense, caused the fire; there is nothing to justify the inference that the rebels would have destroyed the government stores found in the city hall, by fire or otherwise, nor to justify the inference that the destruction of the goods or any loss thereof would have happened to the plaintiffs by the capture and the occupation of the city by the rebels. As matter of fact there was no connection, direct or by necessary inference, between such destruction of the goods and the attack of the rebels, the capture of the United States forces and the occupation of the city.

But it is said that such attack by a superior armed force created a military necessity that the government stores should be destroyed; which destruction, in the manner in which alone it could be done, involved the destruction of the plaintiffs' goods, and so that destruction was the necessary result of the attack; that the fire, being thus the necessary result of the attack, it " happened by means thereof."

The fire was actually and voluntarily communicated to the city hall by the military authority of the United States. It is conceded on this trial that, in the exigency, it was a lawful exercise of such military authority. The power was discretionary, and, if the circumstances were such as made it discreet,—and no doubt they were,—such setting fire to the city hall may have been a duty. In saying that it was voluntary we only mean that it was not a physical necessity, nor the physical result of any agency or act of the rebels or of their unlawful or usurped power. It was physically independent of them, hostile to them, and an act which they not only did not commit but would not have committed, and would if possible have prevented.

What is called a military necessity was therefore nothing more than this; it constituted the motive, and no doubt the sufficient motive, to the burning of the city hall. This was not even an act of resistance to the attack upon the city; it was no part of the defence, nor a force employed in any wise in maintenance of the authority or possession of the government. It was done in the exercise of military discretion for the incidental purpose of preventing an accession to the means of the rebels for maintaining their rebellion. The importance of preventing such an accession to their means furnished a motive, and it may be conceded a controlling motive, to the burning of the city hall, but that did not make the fire happen *by means* of anything done by them. In a certain sense it may be true that the city hall was set on fire *by reason* of the attack upon the city by an armed force of rebels, but between that attack and the fire was interposed another actor who caused the fire, who set in operation the means by which it happened. An efficient and a sufficient cause of fire, and the means by which it happened, intervened between the acts of the rebels and the fire itself, and a cause or means without which, (notwithstanding the acts of the rebels,) the fire would not have happened at all.

In the language of Mr. Justice MILLER, in the Supreme Court of the United States, in *Insurance Co.* v. *Tweed*, (7 Wallace, 52,) "If a new force or power has intervened, of itself sufficient to stand as the cause of the misfortune, the other must be considered as too remote." That language was used in reference to a similar provision in a policy of insurance, and in aid of the enquiry by what "means" the fire happened. There, as in this case, there was, in some sense, another cause but for which the fire would not have happened at all. And the opinion shows that the existence of just such an influential cause is not enough to bring a case within the proviso. The facts here are much stronger than the reasoning there, in withdrawal of the case from the operation of the proviso, because, although the fire would not have happened but for the existence of such remote cause, (the attack by the rebels;) it is equally true that such remote cause would not have produced the fire at all.

To apply the criterion suggested by Mr. Justice MILLER, there was here the intervention of distinct, new, affirmative power and force, other than the acts of the rebels, not only sufficient but efficient as the cause of the fire in the city hall, and the actual means by which it happened.

We think therefore that it cannot be held that, within the meaning of the proviso in question, the fire which destroyed the plaintiffs' goods happened by means of the rebellion or of anything done by the rebel forces.

2. An obvious enquiry is suggested by the facts stated:— Whether the setting on fire of the city hall was the cause of the loss in such sense that, within the proviso, it was "the means" by which the fire happened? or whether that also was not the remote cause of the fire which destroyed the plaintiffs' goods.

In our preceding discussion we have assumed that the setting on fire of the city hall was the means of the fire to the plaintiffs' goods, within that proviso, unless the rebellion or the acts of the rebels should be held such means; that in this sense the acts of the lawful military authorities of the United States were the proximate and efficient cause and means by which the fire happened and of the destruction of those goods by fire.

We do not find it necessary to discuss the question, what was the proximate and what was the remote cause of such destruction, under this head. The suggestion that the setting on fire of the city hall was only the remote cause, while the casual and incidental communication of the fire to the plaintiffs' store from the burning building next adjacent thereto was the proximate cause of the fire and the means by which the fire happened, is not made by the counsel for either of the parties. The contrary is conceded, if not insisted upon, by both. The decision by the Supreme Court in *Insurance Co.* v. *Tweed*, was assumed by both to be decisive against such a suggestion. We are therefore not called upon to pursue that subject.

3. It remains to consider the claim of the defendant, that the fire happened by means which exempt the company from

liability upon the ground that it was caused by "military power," and was therefore within the very words of the proviso.

It is insisted by the plaintiffs that the word "military," in the connection in which it is found in the proviso, does not mean the lawful military power of the government, acting lawfully, in the performance of the proper duty of the government forces, whether engaged in hostile contest with an invading army or in a forcible endeavor to suppress an internal rebellion.

For reasons which seem to us convincing we are of opinion that the word "military," in the proviso in question, has no reference to the lawful acts of the military power of the government. Neither the reasons for the insertion of the proviso in policies of insurance against fire, nor the history of that insertion, nor any judicial decisions upon the meaning and purport of the proviso, nor the discussions had upon its construction, with especial reference to the meaning of other terms employed therein, sustain the interpretation for which the defendant contends. It is true that the precise question, what is the import and legal effect of the word "military," does not appear to have been decided in any case to which our attention is called. And had that proviso been now for the first time employed to exempt the defendant from a portion of the liability which the preceding general agreement for insurance imports, there would be much plausibility in the argument that the defendant intended not only to exclude liability for the consequences of an insurrection, invasion or rebellion, but for the possible consequences of those violent and forcible means which may be necessary to repel or suppress it. And yet, if this was the intent, it may be pertinently asked, why was the exemption limited to the employment of military force and not made to include the forcible or violent measures which municipal authorities or police organizations might find it necessary to employ to suppress a riot, insurrection, or civil commotion?

The proviso containing the words "military or usurped power," was inserted in policies as early as 1720, and the

history of the subject, as given in Ellis on Insurance, page 41, Park on Insurance, page 657, and Marshall on Insurance, page 791, shows that the occasion thereof was manifestly the liability to loss by fire caused by a foreign enemy and invasion. And the terms "military or usurped power" were used in reference to the existence of claims to the exercise of governmental authority, enforced within the kingdom and constituting rebellion against the recognized government. The clause originally embraced no other terms than were apt to indicate the violence of enemies from abroad, and of usurpation exercising governmental authority, or rebellion sustained by organized forces within the kingdom.

The exception as then introduced into policies read as follows: "No loss or damage by fire happening by any invasion, foreign enemy, or any military or usurped power whatsoever, will be made good by this company." The idea of interference with the peace and safety of the realm, by organized force from abroad or rebellion rising to the proportions of actual or at least formal usurpation of governmental authority, (whether more or less successful,) and manifestly hostile to the lawful government, is indicated by this language. The experience of the country, in those days of not infrequent invasion and rebellion, the result of disputes touching the right or the succession to the crown of England, gave occasion for the exception, and by suggesting its cause furnished also an explanation of its meaning. Foreign invading armies and the organized forces, rallied in whole or in part within the kingdom, to overturn the government or to enforce the alleged title of a claimant to the crown, usurping or endeavoring forcibly to usurp governmental authority, were in view. Reason for refusing to become liable for losses caused by these forces, in either form, is found, not only in helplessness and inability to resist them and the magnitude of the destruction they may affect, but in the want of recourse for indemnity to those who commit the violence.

It is well and pertinently suggested that, while on the one hand no one would think of obtaining insurance against the lawful acts of the government, so on the other an insurer

would not think of excepting such lawful acts as a cause of the fire against which he insured. The citizen without insurance and an insurer making insurance, if that contingency was contemplated, would regard his government as bound and presumptively always ready to indemnify against losses sustained by acts done in its own defense or in maintaining the authority of the laws.

The subsequent extension of the proviso to "riot, insurrection and civil commotion," rather confirms than impairs this view of the meaning and intent of the original proviso. And these were held to import occasional, local or temporary out-breaks or lawless violence, which, though temporarily destructive in their effects, did not rise to the proportions of organized rebellion against the government.

The observations made by the court in the few early cases in which this proviso came under consideration, (although any possible separate meaning of the word "military" is not suggested), indicate that the clause has reference to acts done in disregard or in subversion of lawful authority, and includes only such affirmative acts. *Drinkwater* v. *London Assurance Corporation*, 2 Wilson, 363 ; *Langdale* v. *Mason*, referred to by the text writers above cited.

In the last named case Lord MANSFIELD uses this significant language :—" What is meant by military or usurped power ? They are ambiguous and they seem to have been the subject of a question and determination. They must mean rebellion when the fire is made by authority; as in the year 1745, the rebels came to Derby, and, if *they* had ordered any part of the town or a single house to be set on fire, *that* would have been by authority of a rebellion. That is the only distinction in the case. It must be by rebellion got to such a head as to be under authority."

The term "military" is employed in the proviso in a meaning synonymous with the "usurped power" intended to be described, or as qualifying and explaning what was meant by "usurped power." It was in this view, and as a ground of distinguishing between the usurped power specified in the proviso and the power of a mob, that Mr. Justice BATHURST,

in the case of *Drinkwater* v. *London Assurance Corporation*, construed usurped power to mean either an invasion by foreign enemies, to give laws and usurp the government thereof, or an internal force or rebellion, assuming the power of the government, by making laws and punishing for not obeying those laws.

An "invasion" necessarily supposed organization and military power or force; so of the words "foreign enemy;" and in the use of a phrase which should include also violence within the kingdom, viz: "military or usurped power," something in like manner hostile to or subversive of the laws and of lawful government was intended, as plainly as if the clause had been "or any other military or usurped power."

That the terms used in the proviso have express application to force illegally employed and adversely to the government, is indirectly but impliedly involved in the decision and opinion of the court in the *City Fire Ins. Co.* v. *Corlies*, 21 Wendell, 367. The court deemed the meaning of the words "usurped power" long settled. The property there in question was destroyed by order of the mayor of the city of New York, for the purpose of arresting a conflagration. It was claimed that this was a usurpation of power and authority in disregard of the law. The court deemed that, if the mayor had no authority to do the act, the company were still liable, for that it was not a usurpation of the power of government, against which the defendants intended to protect themselves.

The case of *Sprull* v. *North Carolina Ins. Co.*, 1 Jones N. Car. Law R., 126, tends strongly in the same direction; and if an armed patrol may be deemed a "military power," that case is especially pointed and significant.

These considerations, and the significant fact that every other word used in this proviso to designate the means by which a fire may happen for which the company will not be liable, expresses clearly and unequivocally what is unlawful, employed in disregard or in subversion of the laws or the government, furnish a strong case for the application of the maxim relied upon by the plaintiffs, *noscitur a sociis*. This maxim

is not conclusive, but, in a case of doubt, and where a like meaning will satisfy the provision, where there is no other clause or language hostile to the like interpretation, and especially when other considerations tend to support it, the maxim has especial force and significance.

We think it not too much to say that most, if not all, intelligent readers of the proviso in question, would at once declare that the word " military " therein was employed in a sense kindred to the other terms, and that it described an organization military in its form, but unlawful and hostile to the government in its character and purpose.

Again, it is a familiar rule in the construction of provisos and exceptions of this sort, made in qualification of the general positive agreement, that words susceptible of either construction should be taken most strongly against the speaker or party whose language is to be interpreted; and that the general and positive agreement should have effect unless the exception clearly withdraws the case from its operation. This has especial force when the other considerations pertaining to the subject tend to the same result.

To this should be added, that it is the duty of an insurance company seeking to limit the operation of its contract of insurance by special provisos or exceptions, to make such limitations in clear terms and not leave the insured in a condition to be misled. The uncertainties arising from provisos, exceptions, qualifications and special conditions in or endorsed upon policies, have been often condemned, and such special modifications are justly characterized as traps to deceive and catch the unwary. An insured may reasonably be held entitled to rely on a construction favorable to himself where the terms will rationally permit it. Where, as in this case, such construction gives a signification to a word *ejusdem generis* with all those with which it is found associated and in harmony with the general character and purpose of the provision in which they are found, he is clearly entitled to insist upon such construction.

Our conclusion is that the plaintiffs are entitled to judgment for the amount of the insurance, with interest thereon

from the expiration of sixty days from the 2d day of May, 1865, on which day it is admitted the preliminary proofs of loss were furnished to the defendant and with costs.