Burks, J.,
delivered the opinion of the court.
In each of the policies, for the enforcement of which the bill in this case was filed, the Portsmouth Insurance Company, in express terms, promised and agreed, for the *615 consideration of the premium paid, to make good unto the assured, his executors, administrators and assigns, all loss or damage, not exceeding in amount the sum insured, should happen by fire to the buildings specified, for the term of one year, with the stipulation that the insurance (the risk not being changed) might be continued for such further term as should be agreed on, provided the premium therefor be paid and endorsed on the policy, or receipt given for the same.
This general undertaking was limited and qualified by a subsequent clause, common to the two policies: “Provided always, and it is hereby declared, that this corporation shall not be liable to make good any loss or damage by fire which may happen or take place by means of any invasion, insurrection, riot or civil commotion, or of any military or usurped power.”
The defence, upon the merits, to the claim of the amounts insured, on account of the admitted total loss of the buildings by fire, is based on this clause in the policies, the contention being that the loss happened or took place by means of some one or more of the perils excepted therein.
The general undertaking extends to all loss by fire from whatever cause, unless occasioned by the fraud or design of the insured. As said by Judge Bronson in City Fire Insurance Co. v. .Corlies, 21 Wend. R. 367, the company agrees to make good unto the assured all such loss or damage to the property as shall happen by fire. Thus far there is- no limit or qualification of the undertaking. If the loss happen by fire, unless there was fraud on the part of the assured, it matters not how the flame was kindled, whether it be the result of accident or design, whether the torch be applied by the honest magistrate or the wicked incendiary, whether the purpose was to save a city, as at New York, or a country, as at Moscow, the loss is equally within the terms of the contract. That the insurers in *616 tended the general engagement should extend to every possible Iqss by fire is evident from the fact that they after-wards proceed to specify particular losses by fire for which they will not be answerable. See also Ins. Co. of Alexandria v. Lawrence, 10 Peters R. pp. 507, 517, 518.
The loss by fire being admitted, the burden of proof is on the insurer, claiming exemption from liability, to show that it falls within the exceptions. 6 Rob. Prac. 73, citing Pelly v. Roy. Exch. Asso. Co., 1 Burr R. 347.
The first enquiry is, what caused the fire that caused the loss? In other words, what was the proximate cause of the loss? For.the maxim is, In jure, non remota causa, sed próxima spectatur. “ It were infinite,” says Lord Bacon, “for the law to consider the causes of causes, and their impulsions, one of another; therefore it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree.” Brown’s Leg. Max. 217.
The agreed facts will enable us, we think, to answer the enquiry without difficulty.
On the 17th day of April, 1861, the convention of Virginia, then in session at Richmond, passed what is known as the “ordinance of secession.” On and during the 20th of that month the greatest excitement prevailed among the people at Portsmouth. The military companies in the city—five or six in number, forming a part of the Third Virginia regiment of infantry—were, during the day, called out by the governor of the state, and during the night of that day were stationed and picketed in small squads at various points around and near the navy yard. The entire community was excited, and on every hand arrangements of a warlike nature were being made for the sectional strife, which then, it was apparent, was imminent.
On the day and night of the 20th of April, obstructions-were being placed in the Elizabeth river leading to the *617 harbor, for the purpose thereby of preventing the ingress of vessels and the departure of the United States war vessels then in the harbor. About midday of the 20th of-A pril, the gates of the Gosport navy yard were closed to all outsiders, and heavily guarded by United States marines. During the day the marines, sailors and atiaehees of the United States navy on the vessels moored at the wharves within the yard could be seen destroying small arms, and throwing them overboard into the river.
On the evening of that day, about dark, the United States steamer “ Pawnee” came steaming into the port from the city of Washington, with a large number of United States marines, sailors and soldiers on board. She came in with banners flying and a band of music playing the national airs, her guns loaded and run out of their ports. She proceeded to the navy yard, and immediately disembarked the marines, sailors, soldiers and their officers on board, and thereupon soon began a general commotion in the navy yard, caused by the removing of valuable materials therefrom, and the destruction of cannon and other articles which could not be removed from the navy yard. This commotion, removal and destruction continued during the entire night and shortly before daylight of the 21st, when all the marines, sailors, soldiers, officers and every person within the yard, except one or two, who made their escape therefrom during the night, were taken aboard the “Pawnee” and the sail frigates “Constitution” and “Cumberland.” The “Pawnee,” with the latter two vessels in tow, then departed, and proceeded unmolested to Fortress Monroe, or further. Simultaneously with the departure of these vessels, the ship-house and other buildings in the navy yard, and also all the other vessels left at the wharves of the yard and anchored in the stream, were fired by the United States forces, and all were consumed with great rapidity. Soon the fire was communicated from the ship-house to the main-entrance government buildings, and from *618 the latter to the insured buildings, which were wooden buildings covered with shingles. The distance from the ■ ship-house to the main-entrance building was about 170 feet, the space between the two being open and unoccupied, and the distance between the main-entrance building and the insured buildings was about sixty feet. The fire was continuous, and all of these buildings were on fire at one and the same time, and were rapidly consumed. It is one of the facts agreed that the ship-house, the building in which the fire commenced, was “set on fire by forces of .the United States, and by authority of the officers in charge of said forces, themselves acting under authority of the government of the United States.”
From this statement of facts agreed, it would seem too plain to admit of dispute, that the cause, denominated in the law causa próxima—the direct, efficient, controlling, productive cause—of the loss of the insured buildings was the act of the government of the United States in setting fire, by its authorized agents, to the ship-house. The fire, originated by that act, it is agreed, was “continuous.” The force set in motion by the hand that first applied the torch was uninterruptedly and unceasingly operative until all the buildings were destroyed, and the cause of the loss of all was the same, not less of the loss of the one last burnt than of the one first fired.
Although the application of the maxim referred to is often difficult and embarrassing, yet in determining in each particular case whether the alleged cause of a catastrophe is proximate or too remote in a legal view, it is said that one of the most valuable criteria furnished by the authorities is to ascertain whether any new cause has intervened between the fact accomplished and the alleged cause. If a new force or power has intervened of itself sufficient to stand as the cause of the misfortune, the other must be considered as too remote. Ins. Co. v. Tweed, 7 Wall. U. S. R. 44, 52. To the same effect are Milwaukee *619 &c., Railway Co. v. Kellogg, 94 U. S. R. (4 Otto), 469; Ins. Co. v. Transportation Co., 12 Wall. U. S. R. 194, 199; Ins. Co. v. Seaver, 19 Wall. U. S. R. 531, 542.
Certainly, in this case, there was no new independent cause intervening between the alleged canse (the setting fire to the ship-house) and the accomplished fact (the destruction of the Reynolds' buildings) sufficient of itself to stand as the cause of the misfortune which occurred.
In this connection, it is convenient to notice a view of the case presented, but not much relied on, by the learned counsel for the appellant—to wit: that the navy yard was fired by the lawful orders of the United States government forces in consequence of a threatened attack of the rebel forces of Virginia, and that this threatened attack of the usurping military force or power of Virginia was the predominating and operative cause of the fire. And in support of this view, we are referred to the decision of the supreme court of the United States in Ins. Co. v. Boon, 95 U. S. R. (5 Otto), 117.
The ease briefly stated was this: The suit was brought to recover the amount insured against loss by fire on a stock of goods of the plaintiff in their storehouse at Glasgow, in the state of Missouri. The insurance was effected in 1864, while war was flagrant between the United States and the Confederate States, and the goods were destroyed by fire on the 15th day of October, 1864, under the following circumstances: Glasgow was a military post and a place of deposit for military stores of the United States, which were in the city hall. The city was occupied, guarded and defended by a military force of the United States under the command of Col. Harding.
At an early hour of the morning of the 15th of October, 1864, an armed Confederate force, under military organization, surrounded and attacked the city and threw shell and shot into it, penetrating some buildings, and one thereof penetrating the store of the plaintiffs, but without *620 setting fire thereto or causing any-fire therein, and some ° _ 0 . of the shell killed soldiers-and citizens. The city was deby Colonel Harding and the military forces under ]jis command, and a battle between the United States-troops and the Confederate forces continued for many hours. The citizens fled to places of security, and no civil government prevailed in the city.
During the battle, and when the United Stales troops had been driven from their exterior lines of defence, it became apparent to Colonel Harding that the city could not be successfully defended, and he thereupon, in order to prevent the military stores from falling into the possession of the Confederate forces, ordered one of the officers under-his command to destroy them.
In obedience to this order to destroy the said stores, and-having no other means of doing so, the officer set fire to the city hall, and thereby the building with its contents was consumed. Without other interference, agency or instrumentality, the fire spread along the line of the street from the city hall to the building adjacent thereto, and from building to building through two other intermediate-buildings, to the store of the plaintiffs, and destroyed the-same, together with its contents, including the goods insured by the defendant’s policy. During this time, and until after .the fire had consumed the goods, the battle continued, and no surrender had taken place, nor had the Confederate forces, nor any part thereof, obtained the possession of or entered the city.
Upon these facts and circum dances, the supreme court was of opinion and decided that, what it was pleased to style the “rebel invasion” or “the usurping military force or power,” was the predominating and operative cause of the fire that destroyed the goods insured, overruling the decision of the circuit court for the district of Connecticut, which held the action of the United States military authorities a sufficient cause intervening between the attack of the- *621 ■Confederate forces and the destruction of the plaintiff’s property, and therefore the responsible cause.
If this decision of the supreme court be sound law rightly applied to the facts upon the assumption that the attack on the city of Glasgow was a “ rebel invasion,” or proceeded from a “usurping military force or power”—a conclusion the correctness of which admits of great doubt— yet it furnishes no precedent to guide in the determination of the case before us. There was no attack upon the Gos-port navy yard—no battle—nor, indeed, had the war in Virginia commenced at the time the buildings were destroyed. There was no such exigency—no such urgent military necessity for the burning as existed at Glasgow. The United States government may have been, and doubtless was, apprehensive of danger to the navy yard and the naval stores the're, and this apprehension may have been the occasion or motive for destroying the buildings and stores; but the alleged threatened attack by the military forces of the state was not the cause, in a legal sense, of the destruction, or, if it was, it was the remote, not the proximate, cause. There was an independent intervening ■cause, sufficient of itself to account for the loss, and that cause was the act of the government of the United States in setting fire to the government buildings.
The decision of the supreme court of Pennsylvania in Harris v. York Mut. Ins. Co., 50 Penn. State R. 341, seems not to accord with that of the supreme court of the United States in Insurance Co. v. Boon, supra, in the application of the rule of law as to proximate and remote causes. In that case, the policy excepted “ loss by fire occasioned by mobs or riots.” The Confederate forces had invaded Pennsylvania, and in order to impede their advance, the Federal troops, by authority of the military officer commanding that department, burned a bridge, the fire from which communicated with and destroyed the insured building. It was held that the fire was occasioned approxi *622 mately by lawful orders of the military authorities of the United States, and remotely by an invading army, which -was much more than either a mob or a riot in the ordinary acceptation of those terms.
Our conclusion, therefore, is, that the proximate cause of the loss of the Reynolds’ buildings was the act of the government of the United States through its officers and soldiers setting fire by its authority to the buildings at the navy yard.
The next enquiry is, does this loss fall within the excepting clause of the policies ? Was it a loss by fire which happened or took place “ by means of invasion, insurrection, riot or civil commotion, or of any military or usurped power?” The terms, “insurrection, riot or civil commotion,” may be laid out of view, as they can have no application to the government of the United States, whose act has been shown to be the responsible cause of the fire. Their meaning, when found in excepting clauses of policies of insurance, is defined or explained in some adjudged cases. Langdale v. Mason (a nisi prius case before Lord Mansfield), 1 Bennett’s Fire Ins. Cas. 16; Spruill v. North Car. Mut. Life Ins. Co., 1 Jones R. 126. See also May on Ins. 490, 491. Lord Mansfield in Langdale v. Mason states, that the words “civil commotion’’ were introduced in policies as early as 1727—words, said he, as general and untechnieal as can possibly be used. His idea of a “civil commotion” is thus expressed: “I think a ‘civil commotion’ is this: an insurrection of the people for general purposes, though it may not amount lo a rebellion where there is a usurped power.” In Spruill v. North Car. Mat. Life Ins. Co., the court, after defining a riot, describe a commotion, according to Worcester, as being a tumult, and a tumult as being a promiscuous commotion in a multitude—an irregular violence, a wild commotion.
The terms being very general do not perhaps admit of *623 any exact definition. So it is, whatever ideas they are intended to convey, it would seem too clear for controversy, they are descriptive of no act, fact, or state of which, on the evidence in the record, could stand as the proximate cause of the fire in this case, nor was the learned counsel of the appellant understood as contending to the contrary in the elaborate argument addressed to this court,
Passing by these terms, without further remark, our enquiry is confined to the words “invasion* * * or military or usurped power.” What was intended by them, as used ? They were first introduced in policies more than a century and a half ago. The word “ invasion ” seems at first to have been followed immediately “ by foreign enemies.” These last words, at some subsequent period, appear to have been dropped. There is no ambiguity in the word “invasion,” but in Langdale v. Mason & others supra, decided in 1780, Lord Mansfield said the words “military or usurped power” were ambiguous, but they had already been the subject of a judicial determination. He had reference to the judgment of the common pleas in Drinkwater v. The Corporation of the London Assurance, rendered in 1767. See Bennett’s Fire Ins. Cas. 12. In that case, the proviso in the policy was, “ that the corporation shall not be liable in case the same (the building insured) shall be burnt by any invasion by foreign enemies, or any military or usurped power whatsoever.”
Mr. Justice Bathurst was of opinion, that the words “ usurped power ” in the proviso, according to the true import thereof and the meaning of the parties, could only mean an invasion of the kingdom by foreign enemies to give laws and usurp the government thereof, or an internal armed force in rebellion assuming the power of government by making laws, and punishing for not obeying those laws.
Clive, Justice, was of opinion, that the words “usurped power” in the proviso, must mean such an usurped power as amounts to high treason, which is settled by 25 Edw. 3.
*624 Wilmot, Chief Justiee, said, “ my idea of the words , burnt by usurped power, from the context, is, that they ■ mean burnt or set on fire by occasion of an invasion from abroad, or of an internal rebellion, when armies are em- ' . . ployed to support it; when the Jaws are dormant and silent, and the. firing of towiis is unavoidable.”
Lord Mansfield, in the subsequent case of Langdale v. Mason & others, supra, said, “ they (the words ‘ military or usurped power’) must mean rebellion conducted by authority, as in the yearJJ&45, when the rebels came to Derby; and if they had ordered any part of the town or a single to be set on fire, that would have been by authority of a rebellion. That is the only distinction in the case; it must be by rebellion got to such a head as to be under some authority. * * * * Usurped power takes in rebellion acting under usurped authority.”
In City Fire Ins. Co. v. Corlies, 21 Wend. R. 367, Judge Bronson defines the words “usurped power” in a policy as meaning “an usurpation of the powers of government.”
These cases do not distinguish between “ military power” and “usurped power,” and Lord Mansfield plainly speaks of both as the same. His language is, “ the words military or usurped power are ambiguous, but they have been the subject of a judicial determination. They must mean rebellion conducted by authority,” &c.
It was strenuously argued before the supreme court of the United States in Ins. Co. v. Boon, supra, that these words, “ military or usurped power,” should be construed as meaning military and usurped power; that they do not refer to military power of the government lawfully exercised, but to usurped military power, either that exerted by an invading foreign enemy or by an internal armed force in rebellion, sufficient to supplant the laws of the land and displace the constituted authorities. In noticing *625 this argument, the court said, there is, it must be admitted, considerable authority, and no less reason, in support of this interpretation, but they did not deem it necessary to the decision of the case before them to affirm positively that such is the true meaning of the words in the connection in which they were used in the policy under review.
The reasoning of Judge Woodruff, who decided the case in the' court below, is, in our judgment, conclusive to show that the term “ military” is employed in the proviso in a meaning synonymous with the “usurped power” intended to be described, or as qualifying or explaining what was meant by “ usurped power.” After referring to the cases already cited, he adverts to the significant fact that every other word used in the proviso to designate the means by which a fire may happen for which the company will not be liable, expresses clearly and unequivocally what is unlawful, employed in disregard or in subversion of the laws or the government, and this fact, among other considerations, furnishes a strong case for the application of the maxim, noscüur a sotáis.
He observed, “We think it not too much to say, that most, if not all, intelligent readers of the proviso in question would at once declare that the word ‘ military’ therein was employed in a sense kindred to the other terms, and that it described an organization military in its form, but unlawful and hostile to the government in its character and purpose.”
The lucid and very able opinion of this learned judge will be found in the supplement to 40 Conn. Rep., 575 et seq.
It would seem that the Portsmouth insurance company has virtually acquiesced in this construction of the word “ military,” as since the war it has, and perhaps other insurance companies have also, added war to the excepted perils.
With the understanding of the terms “ military or *626 usurped power,” used in the proviso, as expounded in these authorities, the further enquiry is, did “ the fire hap-pen or take place by means of invasion” by a foreign enemy? At the time the fire took place, was the government of the United States foreign to the state of Virginia, and was the firing of the buildings at the navy yard an act of “invasion” on the part of the United States, within the meaning of the policies? If so, it must be because, by virtue of the ordinance of secession passed by the convention on the 17th day of April, 1861, Virginia, on and after that day, became a separate, independent, and absolutely sovereign state, and as such entitled to the navy yard as a part of her territory, and the further occupation of the same against her will and the destruction of the buildings thereon by the United States were hostile acts of a foreign enemy. And so it has been argued before us.
The assumption, that the ordinance, on its passage by the convention, was designed to operate eo instanti as a complete and final separation of the state from the Union, is not supported by the facts of history.
When the general assembly, on the 14th day of January, 1861, passed the act providing for an election on the 4th of February, 1861, of delegates to the convention, it provided at the same time, after much debate, for the ■opening of a separate poll to take the sense of the qualified voters as to whether any action of said convention ■dissolving the connection of the state with the Federal Union, or changing the organic law of the state, should be •submitted to the people for ratification or rejection; (Acts of 1861, ch. 3, § 1); and at said election, a very large majority of the people voted that such action, if taken, should be so submitted. The convention thus constituted was therefore one of limited powers, at least as t,o the subject of changes in existing Federal relations and in the state’s constitution. No ordinance of secession passed by that body could be effectual and binding on the people of the *627 state unless and until it was submitted to aud ratified by the people. The convention itself recognized this fact, and accordingly the ordinance of the 17th of April provided, that it should take effect and be an act of that day, when ratified by a majority of the votes of the people of the state, cast at a poll to be taken thereon on"the fourth Thursday of May following. It was submitted and ratified on that day. Until so ratified, however, it was not a complete act. It was inchoate and not consummate until that day. In the meantime, the convention, recognizing the conditional character of the ordinance, on the 25th •day of April, 1861, by a further ordinance of that date, ratified and confirmed articles entered into by its commissioners for a “temporary union of Virginia and the Confederate States”] and by a still further ordinance of the same date, adopted and ratified the constitution of the provisional government of the Confederate States ordained and established at Montgomery, Alabama, on the 8th day of February, 1861, but with a proviso, “that this ordinance shall cease to have any legal operation or effect, if the people of this commonwealth, upon the vote directed to be taken on the ordinance of secession passed by this convention on the seventeenth day of April, eighteen hundred and sixty-one, shall reject the same.” See ordinances, Nos. 2, 3, appended to acts of 1861. It was not until the 19th of June, 1861, that the convention, formally ratified what was called the permanent constitution of the Confederate States, and proclaimed it binding upon the people of the commonwealth. Ordn. No. 56.
In the light of these facts, it cannot be said that the government of the United States, on the 21st day of April, 1861, the fourth day after the passage of the conditional ordinance of secession by the convention, was foreign in its relation to the state of Virginia, and that the occupation of Gosport navy yard and the destruction of the government buildings therein were hostile acts of a foreign *628 invader. Giving all the effect to the ordinance designed by its authors, the state had not then ceased to be a member of the Union. The United States were in possession of the navy yard and of the buildings they had erected, under a title acquired in the year 1800 (1 R. Code, ch. 10) by purchase from the state under an act of the general assembly ; and the destruction of the buildings, to prevent their falling into other hands, could not be justly construed as an act of hostility to the state. The subsequent ratification of the ordjnance by the people could not have the effect, by relation to the day of its passage, to change the actual status of the two governments on that day, so as to make acts tortious which otherwise would not be so, and • defeat the just rights of private citizens.
There was no war existing at that time between the United States and the state of Virginia. What was said in Roberts’ adm’r v. Cocke & others, 28 Gratt. 207, 219, must betaken in reference to the subject matter—the period fixed by the legislature for abatement of interest. It was not necessary to decide in that case, nor was it intended to decide, when .the war actually commenced. The supreme court of the United States has found it necessary, in several cases before it, to fix the periods of the commencement and termination of the war. For the former (the commencement of the war), as to the several states, the dates of the president’s proclamations of intended blockade have been assumed as the proper dates. The proclamation as to Virginia was on the 27th day of April, 1861. The Protector, 12 Wall. U. S. R. 700; Adger v. Alston, 15 Wall. U. S. R. 555; Brown v. Hiatts, Id. 177.
It follows, from what has been said, that, in our opinion, ■ the loss of the insured buildings by the fire which took place on the 21st of April, 1861, was covered by the general undertaking of the insurers, and was not within the operation of the excepting clauses of the policies.
Several assignments of error of minor importance, which, *629 with due regard to l’egularity, should have been considered in the first part of the opinion, remain to be disposed of.
1. The ninth condition of the policies requires persons ■ sustaining loss or damage by fire to forthwith give notice thereof to the company, and as soon after as possible to furnish what is usually denominated “preliminary proofs” of the loss. This condition was never complied with, and the appellant contends that the bill, for that reason, should have, been dismissed. Compliance is a condition precedent to the right of recovery, unless it has been waived by the insurer. The appellees rely on such waiver. It is an old maxim of the law : Qudlibet potest renunciare juri pro se introducto; anyone may, at his pleasure, renounce the benefit of a stipulation or other right introduced entirely in his own favor. Brown’s Leg. Max. 699.
The principle is of most frequent application in cases of policies of insurance, which usually abound in conditions and stipulations introduced by the insurer exclusively for his own benefit. Waiver may be express or implied. It may be shown by acts or conduct as well as by words.
A distinct denial by the insurer of liability and refusal to pay, on the ground that there is no liability, is a waiver of the condition requiring proof of loss. It is equivalent to a declaration of the insurer that he will not pay, though the proof be furnished; and to require the presentation of proof in such case, when it can be of no importance to either party, and the conduct of the party in favor of whom the stipulation is made has rendered it practically superflous, is but an idle formality, the observance of which the law will not sustain. May on Insurance, 573, and authorities there cited ; Flanders on Fire Insurance, 541, 542; West Rockingham Mut. Fire Ins. Co. v. Sheets & Co., 26 Gratt. 854.
We th'ink the waiver is established in this case. It sufficiently appears by the answer to the bill. For the answer, while in terms it denies the waiver, admits facts *630 which substantially show it. The language is, “ This defendant admits that verbal application for the payment of losses claimed by the plaintiff was made; but this defendant never, by any act or word, admitted the justice of , ., . .... . .. the plaintiffs claim, but at all times denied it, and at all times refused payment on the ground . that the company was not responsible for losses occasioned by the burning of the said houses, inasmuch as the said fire happened and took place by means of invasion, insurrection, riot, civil commotion, military and usurped power.”
The object of requiring notice and proofs of loss is to-enable the insurer to investigate the claim before he shall be compelled to pay it; but if, at the time the loss occurs, he has, as in the present ease, personal knowledge of it,, the cause, occasion, and extent of it, and the attending facts and circumstances, and from this knowledge has determined not to pay the amount insured or any part thereof, and on application denies all liability and refuses payment, it would indeed seem to be a futile thing, under-such circumstances, for the insurer to give formal notice or furnish preliminary proofs.
2. The appellant also assigns as error the refusal of the-court to dismiss the bill of the complainants on demurrer based upon the ground that they had a plain and adequate-remedy at law.
The policies insured Joseph P. Reynold, his executors,, administrators and assigns, for the term of one year from date, with the stipulation, which has been referred to, that, the insurance might be continued for such further term as should be agreed on, provided the premium therefor be paid and endorsed on the policy or receipt given for the same.
Under this stipulation, the insurance was continued from year to year during the life of Reynolds by the regular payment of annual premiums and taking receipts for the same. By the death of Reynolds intestate, and while the *631 policies were in force for the current term of one year, the property which was the subject of the insurance descended to Robert E. Reynolds, a minor, the surviving child and only heir at law of the intestate, subject to the dower therein of the intestate’s wife, who also survives him.
After the death of Joseph R. Reynolds,, the insurance was continued, under the stipulation aforesaid, from year to year by the payment of annual premiums by his widow, who was the administratrix of his estate, and the policies thus kept in force were binding engagements at the time of the loss.
Under these circumstances, it is doubtful whether any action at law could be maintained on the policies by the widow, in her character of administratrix, or alone in her individual right, there being a question whether the insurance money when recovered would be assets in her hands as administratrix, liable to the intestate’s debts and distributable as personal estate, or whether the money does not stand in the place of the buildings and become divisible between the heir and herself in the proportion of their respective interests in said buildings, in which event a court of equity only could adequately provide for the investment of her portion so as to secure the principal to the heir at her death.
At all events, if there was any remedy at law it was not plain, and the case was a proper one for equitable cognizance.
This case is distinguishable from Geo. Home Ins. Co. v. Kinnier’s adm’x, 28 Gratt. 88. There the loss occurred after the death of the plaintiff’s intestate, but during the term of the insurance contracted for by him in his lifetime, and there had therefore been no renewal of the policy after his death. But the question decided on the demurrer turned upon the construction of the words, “ legal representatives,” in the policy, the contention of the defendant being that they meant heirs, and that the undertaking was *632 to insure the heirs. The decision was that the words were of the same import with the words executors, administrd¡tors, personal representatives.
3. The circuit court gave a decree (the same appealed from) in behalf of the complainant for the aggregate amount of the sums insured, with interest from the 21st of June, 1861, until paid, and for costs. The appellant assigns as error the allowance of interest during the war,
The decision in Roberts’ adm’r v. Cocke & others, and Murphy v. Gaskins’ adm’r, 28 Gratt. 207, is a complete answer to this assignment.
Upon the whole case, we are of opinion that there is no error in the decree of the circuit court, and that it should be affirmed.
Moncure, P., and Christian, J., dissented.
Decree affirmed.